UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                                        :

SHANE WATSON,

                  Petitioner,         :        99 Civ. 1364 (PAE) (GWG)

      -v.-                     :        <u>REPORT AND</u>
                                                         <u>RECOMMENDATION</u>

CHRISTOPHER ARTUZ, Superintendent,    :
Green Haven Correctional Facility,

                                      :

                  Respondent.

                                      :
-------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

Before the Court is Shane Watson's petition for a writ of habeas corpus under 28 U.S.C.

§ 2244(b)(2)(B).[1] Watson seeks review of his conviction for second-degree murder. In the

petition before this Court, Watson alleges that his Fifth and Fourteenth Amendment rights were

violated because (1) his conviction was based on perjured testimony; (2) his conviction was

based upon evidence that the prosecution knew or should have known was false; and (3) the

prosecution withheld material exculpatory evidence. Watson's attack on his conviction centers

on the recantation testimony of a critical prosecution witness, Christine Holloway. For the

reasons stated below, Watson's petition should be denied.

---

[1] Second Petition for a Writ of Habeas Corpus, filed June 28, 2016 (Docket # 28) ("2d
Pet."); Declaration of Robert J. Boyle, filed June 28, 2016 (Docket # 29) ("Boyle Exs.");
Declaration of Robert J. Boyle, filed June 28, 2016 (Docket # 30) ("Boyle Decl.");
Memorandum of Law in Support of Petition for Writ of Habeas Corpus, filed June 28, 2016
(Docket # 31) ("Pet'r Mem."); Declaration in Opposition to Second Petition for a Writ of Habeas
Corpus, filed Sept. 27, 2016 (Docket # 41) ("Braun Decl."); Memorandum of Law, filed Sept.
27, 2016 (Docket # 42) ("Resp't Mem."); Reply Memorandum of Law in Support of Petition for
Writ of Habeas Corpus, filed Dec. 12, 2016 (Docket # 47) ("Pet'r Reply"); Letter from Justin J.
Braun, filed Dec. 13, 2016 (Docket # 48); Letter from Justin J. Braun, filed Dec. 28, 2016
(Docket # 50) ("Braun Letter"); Letter from Robert J. Boyle, filed Jan. 18, 2017 (Docket # 51).

I.  FACTS

    A.  Background

    On October 9, 1991, Mark Johnson was shot and killed at 1961 Schieffelin Avenue in the

Bronx, New York.  (Crecco: Tr. 442:2-444:16; Holloway: Tr. 529:9-13, 536:24-537:21; Jones:

Tr. 696:12-697:15).[2]  On November 12, 1991, Watson was indicted for Johnson's murder.

Respondent's Brief, People v. Watson, dated Aug. 1997 (attached as Ex. 3 to Braun Decl.)

("Resp't Appeal Br."), at 3.[3]  On October 13, 1993, following a jury trial, Watson was convicted

of murder in the second degree.  (Tr. 879, 946:6-949:7).  Judgment in the case was entered on

November 23, 1993, and Watson was sentenced to 25 years to life in prison.  Resp't Appeal Br.

at 1; Brief for Defendant-Appellant, People v. Watson, dated May 1997 (attached as Ex. 2 to

Braun Decl.) ("Def. Appeal Br."), at 1.

    B.  Trial

    At trial, Holloway was the only witness who made an in-court identification of Watson as

the person who killed Johnson.  (See Holloway: Tr. 543:6-544:19, 575:23-576:2).  According to

Holloway, on the night of the shooting, she was returning home from her job as a corrections

officer.  (Id. 528:14-529:13).  While driving on Schieffelin Avenue in the Bronx, Holloway saw

a BMW automobile with its lights on parked near a fire hydrant and someone standing beside the

car.  (Id. 530:2-531:15).  Holloway then turned right from Schieffelin Avenue into her building's

---

    [2]  "Tr. ___" refers to the trial transcript.  The transcript filed as Docket # 38 begins on
page 488.  However, the Court received a paper courtesy copy of the transcript that begins on
page 406.  While the paper version omits some pages and places some pages out of order, we
have filed it on the docket (Docket # 52) so that the pages missing from Docket # 38 are
included in the record.

    [3]  The exhibits to the Declaration of Justin J. Braun (Docket # 41) are attached to
respondent's memorandum of law (Docket # 42).

parking lot. (Id. 530:2-532:4). As Holloway was driving forward in the parking lot and preparing to back her car into a parking space, another person wearing a "dark-colored hooded jacket" or "sweater hood" and "dark pants" walked in front of her car, whom Holloway ultimately identified as the petitioner. (See id. 531:24-533:5, 534:11-17, 543:25-544:19). Holloway was able to see the individual's face and other aspects of his appearance. (See id. 533:21-535:19). Holloway testified that "their face was in a scowl, like they was angry." (Id. 534:7). She described his eyebrows as being "like a hood over [his] eyes." (Id. 535:16-17). There was nothing blocking her view of him. (Id. 545:17-20). She saw his eyes, his mouth, and his forehead just below the hairline. (See id. 588:21-590:20).

After the person walked in front of her car, Holloway backed her car into a parking spot while still facing the direction that she saw the person walk past. (See id. 536:17-23). After Holloway parked, she heard a gunshot, looked up, and saw the person who had walked in front of her car shooting the person she had previously seen by the BMW. (See id. 536:24-538:19). The shooter began to chase the victim and run in the direction towards Holloway, and she again had an opportunity to view the shooter's face and other aspects of his appearance. (See id. 538:6-539:9). The shooter chased the victim around a building, out of Holloway's line of sight. (See id. 539:20-540:6). Then, the shooter returned from around the building and Holloway again had an opportunity to see him across Schieffelin Avenue. (See id. 540:10-541:7). After the police arrived on the scene, Holloway exited her car and eventually went to the police precinct to report what she saw. (See id. 541:22-542:11).

As part of the investigation into the shooting, Holloway participated in a line-up to identify the shooter, during which she identified Watson. (See id. 542:12-544:19). Holloway also gave an in-court identification of Watson as the shooter. (See id. 543:25-544:19).

Holloway testified that she was approximately five feet away from the shooter when she first saw him. (Id. 544:21-545:15). Nothing blocked her view of the shooter and there was lighting provided by the exterior lights of her car and lights in the parking lot. (See Holloway: Tr. 545:17-546:2). Holloway repeated that she was able to see the shooter's face. (See id. 546:3-4). When asked if she had any doubt about her identification of the petitioner, she answered "no." (Id. 543:20-24).

Monique James testified that she was in the bathroom of her apartment at 1961 Schieffelin Avenue when she heard gunshots, looked out a nearby window, and saw a "black male" of medium build and height running along the sidewalk. (M. James: Tr. 625:8-626:18, 629:6-12, 631:10-632:17, 634:8-636:12). Monique's sister, Robin James, was fourteen years old at the time of the shooting and testified that she was in her bedroom doing her homework when she heard gunshots, looked out her bedroom window, and also saw a man, dressed in black pants and a black "hoody" sweatshirt, holding a gun in his right hand and shooting at another man who was running ahead of him. (R. James: Tr. 648:23-650:15, 652:7-653:15, 663:2-11). The man being shot at fell to the ground approximately 18 feet away from her and directly across from the James's apartment. (R. James: Tr. 653:20-655:25).

Detective Sevelie Jones testified that Robin told him that the shooter was a "male black five feet eight, thin build, dark skin, approximately twenty years of age." (Jones: Tr. 735:9-15). Detective Jones showed Robin a photo array, and she identified Watson from the frontal array pictures. (See id. 736:4-737:3). Because she could make this identification from the frontal pictures, the detective did not ask her to make an identification from the profile pictures. (See id. 737:4-8). Monique described the shooter as a "[m]ale, brown skin, eighteen to twenty-two years of age, skinny, five feet nine" but stated that "she cannot I.D." the shooter. (Id. 729:15-19,

4

730:6-8). She identified Watson as the shooter from the profile array pictures but could not make an identification from the frontal array pictures. (M. James: Tr. 638:18-639:20, 641:23-644:24; Jones: Tr. 737:9-739:3). On October 15, 1991, two separate line-ups were conducted in which Monique and Robin positively identified Watson. (M. James: Tr. 639:6-642:22, 645:1-646:9; R. James: Tr. 666:10-668:12; Jones: Tr. 700:5-705:24, 757:2-761:8).

Detective Frank Morelli testified that on November 20, 1991, Holloway identified Watson as the shooter during a lineup. (See Morelli: Tr. 510:3-526:5; see also Holloway: Tr. 542:12-544:19).

The defense case consisted of two witnesses: Jesus Jimenez, a resident of the area who claimed to have seen the shooting and was familiar with Watson; and Marguerite Martin, a friend of Holloway. On the night of the shooting, Jimenez heard gun shots, looked out his window, and saw a man standing with his back to a body in the street. (See Jimenez: Tr. 770:2-771:8). Jimenez testified that the shooter then "shot twice to a car," and then "ran off." (Id. 771:9-13). The shooter passed in front of Jimenez's window, but Jimenez could not see his face. (Id. 776:11-18). Jimenez knew Watson (see id. 773:24-774:11) and was sure that Watson was not the shooter because the shooter did not "have the same body features as Mr. Watson," and walked differently than Watson, who was "bowlegged and [had] pigeon feet," (Id. 776:19-777:6).

Martin's grandchildren played with Holloway's children and she was thus familiar with Holloway. (See Martin: Tr. 790:22-791:14). Martin testified that she discussed the homicide with Holloway. (Id. 792:9-12). According to Martin, a few days after the shooting, Holloway told Martin that she had seen the shooter run past her car but "could not see his face." (Id. 792:18-793:6). The two discussed the case further and Holloway said that "the police were

harassing her to be a witness." (Id. 793:16-19). The first time that the two discussed the

homicide, Holloway claimed that "it was impossible for anybody to see the [shooter's] face

because of the hood." (Id. 794:2-9). Martin indicated that she had been acquainted with the

petitioner for years and that he was a friend of her children and other relatives. (Id. 794:14-17,

795:22-796:18).

      C.  Appeal of the 1993 Conviction and the First Federal Habeas Petition

      Watson appealed his conviction, raising as issues that he was improperly excluded from

the questioning of two jurors, that a juror was improperly discharged, that he was denied a full

cross-examination of Holloway, that the trial court erred in not questioning a juror post-verdict,

and that his sentence should be reduced in the interest of justice. See Def. Appeal Br. at 23-60.

The Appellate Division affirmed the conviction. People v. Watson, 243 A.D.2d 426, 426 (1st

Dep't 1997). The Court of Appeals of New York denied Watson's request for leave to appeal.

People v. Watson, 92 N.Y.2d 863 (1998).

      Watson filed a pro se petition for a writ of habeas corpus in the Southern District of New

York alleging that the state trial court "1) precluded certain cross-examination of Holloway; and

2) denied petitioner's motion to conduct an evidentiary hearing" into a juror's post-verdict

statement, both in violation of his Sixth Amendment rights. See Watson v. Artuz, 1999 WL

1075973, at *3 (S.D.N.Y. Nov. 30, 1999). His petition was denied on November 30, 1999. Id.

at *7.

      D.  The 440.10 Motion

          1.  Investigation and 2011 Holloway Affidavit

      In 2009, about 10 years after the denial of his first federal habeas corpus petition, Watson

retained attorney Robert J. Boyle to review his case, though not to bring a petition for post-

conviction relief.  See Boyle Decl. ¶¶ 5-6.  Additionally, Watson was in touch with a retired New York City Probation Officer who volunteered to investigate the case without charge.  See id. ¶ 7. In 2011, those working on Watson's case — apparently including Boyle — located Holloway near Atlanta, Georgia.  See id. ¶ 8.  Boyle and others then raised money to fund a Georgia-based investigator to seek out Holloway.  See id.  The investigator located Holloway, who agreed to speak about the case.  See id.  In June 2011, Boyle traveled to Atlanta, interviewed Holloway, and obtained an affidavit from her, which was signed on June 21, 2011.  Id. ¶ 9; see Affidavit of Christine Holloway, dated June 21, 2011 (attached as Ex. 9 to Boyle Exs.) ("Holloway Aff.").

In her affidavit, Holloway said that she "never got a good enough look at the shooter to make any identification" in the 1993 trial.  Holloway Aff. ¶ 5.  She claimed the only reason she identified Watson as the shooter was because "law enforcement told [her] that he was the shooter and [she] believed them."  Id.  She stated that the officers had shown her a single photo of the petitioner, that they told her he was guilty, that they encouraged her to remove a "bad man" from the streets, and that she would be believed because she was a law enforcement officer.  Id. ¶¶ 12, 13, 16.  While she confirmed that she saw someone walk in front of her car on the night of the murder, Holloway said the man "was wearing a hooded sweatshirt" and that she "did not get a good look at his face."  Id. ¶ 7.  Holloway disavowed her trial testimony that the shooter looked at her and made eye contact, saying "[t]hat did not happen."  Id. ¶ 8.  She further stated that after hearing gunshots she saw only "a man holding a gun toward another man," and could not see clearly enough to make any identification — not even to confirm that the shooter was the same person she previously saw in front of her car.  Id. ¶ 9.  Holloway was uncertain whether the shooter eventually came back into her line of vision, as she testified at trial.  See id. ¶ 10.

Even after Watson obtained Holloway's affidavit, Boyle states that "there was still

insufficient funds to retain a lawyer to actually file a C.P.L. § 440.10 motion." Boyle Decl. ¶ 10.

Boyle eventually agreed to take the case if one half of his fee could be raised. Id. ¶ 11. A

retainer was signed in January 2012. Id. "Cognizant that the N.Y.C.P.L. requires that all issues

that can be raised should be raised in a C.P.L. § 440.10 motion, additional investigation was

conducted" — presumably by Boyle. Id. This investigation "included attempting to locate and

interview Monique James, Robin James and an individual named Diana Almonte." Id. ¶ 12.

On July 27, 2012, more than a year after the Holloway affidavit was signed, Boyle filed a

motion on behalf of Watson under New York Criminal Procedure Law § 440.10 seeking to

vacate Watson's conviction. See Affirmation of Robert J. Boyle, dated July 27, 2012 (attached

as part of Ex. 5 to Braun Decl.), ¶¶ 1, 73; Memorandum of Law in Support of Motion to Vacate

Conviction, dated July 27, 2012 (attached as part of Ex. 5 to Braun Decl.) ("Watson 440.10

Mem."), at 24; Boyle Decl. ¶ 12; Braun Decl. ¶ 14.[4] Holloway's affidavit formed one of the

---

[4] Watson moved to vacate his 1993 conviction based on § 440.10(1)(c), (f), (g), (h). See
C.P.L. § 440.10 Decision and Order, filed Aug. 1, 2016 (Docket # 39) ("440.10 Decision"), at 5.
These subsections provide:

    1. At any time after the entry of a judgment, the court in which it was entered
may, upon motion of the defendant, vacate such judgment upon the ground that:
. . .
        (c) Material evidence adduced at a trial resulting in the judgment was false
and was, prior to the entry of the judgment, known by the prosecutor or by the
court to be false; or . . .
        (f) Improper and prejudicial conduct not appearing in the record occurred
during a trial resulting in the judgment which conduct, if it had appeared in
the record, would have required a reversal of the judgment upon an appeal
therefrom; or
        (g) New evidence has been discovered since the entry of a judgment based
upon a verdict of guilty after trial, which could not have been produced by the
defendant at the trial even with due diligence on his part and which is of such
character as to create a probability that had such evidence been received at the
trial the verdict would have been more favorable to the defendant; provided
that a motion based upon such ground must be made with due diligence after

bases of Watson's motion.  Boyle Decl. ¶ 9.

Watson's motion argued that the conviction should be vacated because Holloway's testimony was "false and the prosecution knew or should have known that it was false," Watson 440.10 Mem. at 2, and because the prosecution engaged in prosecutorial misconduct by knowingly using Holloway's perjured testimony and by failing to inform defendant of Holloway's allegedly impeaching or exculpatory statements, id. at 11-15.  The motion also raised various claims of ineffective assistance of counsel.  See id. at 15-24.

### 2. Statement to District Attorney's Office

After Watson filed his § 440.10 motion, the Bronx District Attorney's Office (the "DA") interviewed Holloway.  See Statement of Christine Halloway [sic], dated Jan. 24, 2013 (attached as Ex. 18 to Boyle Exs.) ("Holloway Statement").  In her statement to the DA, which was transcribed, Holloway confirmed that right before the shooting in 1991, she had seen someone walk past her "in a hoody."  Id. 4:20-23.  Shortly after she saw the person in the hoody, she heard gunshots.  Id. 4:23-24.  She turned toward the street and saw two people — one running and one pointing — but she did not "know who the two people were."  Id. 4:24-5:5.  She estimated that she was a block away from the two people she saw after the shooting.  See id. 5:5-6:1.

Holloway said she had not reviewed the case file or any notes before speaking to the DA, but admitted that she was approached by a defense investigator who came to her house the previous year.  See id. 7:14-10:7.  Holloway said she was initially nervous to be approached by

the discovery of such alleged new evidence; or . . .
(h) The judgment was obtained in violation of a right of the defendant under the constitution of this state or of the United States . . . .

the investigator, who apparently came to her house several times attempting to contact her. See id. 10:2-12:13. When the investigator eventually identified himself and his interest in speaking with her, Holloway said she could not remember the case and had "moved on." See id. 12:14-25; see also id. 71:15-73:21. Holloway claimed that as time went on after the trial, however, she began to be concerned about selecting Watson from a photo array. See generally id. 13:12-14:20.

Holloway claimed at the DA interview (and contrary to her affidavit) that the shooter looked in her direction and that she saw his face as he initially walked past her car. See id. 23:2-25. Holloway told the DA that she picked Watson out of a photo array, see id. 69:1-4, and had doubts about the array later only because it was brought up to her so many times, id. 70:24-71:10. Holloway claimed that she would have picked Watson again if shown the photo array 20 years later. See id. 57:20-58:5. She also said that she picked Watson out because his face was "the most familiar face to that night." Id. 58:18-22.

Contrary to the statement in her affidavit that she was shown a single photograph of the petitioner prior to being shown the photo array, Holloway Aff. ¶¶ 12-13, at her session before the DA, Holloway did not recall ever being shown a single photograph, Holloway Statement 59:15-60:19. Also, contrary to her statement in the affidavit that a detective identified the petitioner as the perpetrator before she made her identification, see Holloway Aff. ¶ 12, at the session with the DA, she stated only that a detective said "we know who it was," Holloway Statement 17:6-7, and she could not recall whether that occurred before she looked at "a picture," id. 17:8-19. She also stated that she did not let the detective influence her. Id. 19:24-20:8.

Holloway stated that she did not notice anything wrong with the photo array, id. 51:21-52:2, and that she identified the petitioner from the array because she recognized him from the

night of the shooting, id. 57:1-6. She said that if she had had "doubts" she would have said "what's wrong about this photo array." Id. 71:8-10.

Holloway also agreed with the statement that "everything" that she testified to at trial was the truth as she remembered it. Id. 69:14-16.

### 4. Hearings and Decision on the 440.10 Motion

Evidentiary hearings on the § 440.10 motion were held on various dates in July, August, September, and October of 2013. See C.P.L. § 440.10 Hearing Transcript, filed Aug. 1, 2016 (Docket # 36) ("Hearing Tr."), 1, 123, 146, 168, 213, 253, 299, 391, 447; 440.10 Decision at 6 n.4. At the hearing Holloway recanted her 1993 trial testimony and stated that she was doing so voluntarily. (See Holloway: Hearing Tr. 59:2-62:5, 65:1-13). She claimed that her affidavit recanting her trial testimony was true. (See id. 60:8-61:7). Holloway said she had not learned the outcome of Watson's trial until she was approached by Watson's investigator in Georgia and that after that time she began to doubt her testimony. (See id. 58:21-59:14, 81:12-14). On cross-examination, however, Holloway also claimed that the testimony she gave at trial was "the truth as [she knew] it at the time." (See id. 69:6-8).

Holloway testified that she told detectives shortly after the shooting that she could not identify anyone. (Id. 37:16-38:3). At a precinct interview, Holloway again said she could not identify the shooter from any photos shown to her. (See id. 38:9-41:10). However, the detectives showed her a single photo of Watson and intimated that they thought he was the shooter. (See generally id. 40:22-42:6). Holloway was distracted after having recently signed a "Do Not Resuscitate" order for her brother in the hospital and could not focus on the facts of the shooting, and told the detectives of her distraction. (See id. 41:19-42:6). After being shown the single photo of Watson, Holloway then saw a photo array of people with Watson in it. (See

id. 42:16-44:8).  She claimed she picked Watson from the array simply by noting that it was the same person detectives had just shown her an individual picture of, without meaning that Watson was the shooter.  (See id. 43:25-44:23).  Holloway believed that she was selecting the person who committed the crime, but admitted that she did not recognize the photo as the man who was in the parking lot.  (Id. 44:16-46:20).

Holloway also agreed in the statement that "everything" that she testified to at trial was the truth as she remembered it. (See id. 69:6-12).

As previously noted, in her statement to the DA, Holloway stated that she had seen the shooter's profile and his face front-on as he initially walked past her car.  Holloway Statement 23:2-25.  But at the hearing she denied this.  (See Holloway: Hearing Tr. 27:15-16).  Holloway attempted to explain the differences between her statement to the DA and her hearing testimony — most notably her views on the accuracy of her identification — based on her fear of telling prosecutors the truth and their aggressive behavior when she gave the DA her statement.  (See id. 120:6-121:5).

Holloway's hearing testimony varied from what she said to the DA in another respect: while she told the DA that she was nervous and even afraid to be approached by Watson's investigator (Holloway Statement 10:13-17, 12:1-11, 36:16-24), at the hearing she claimed she had no reason to be fearful because she had done nothing wrong (see Holloway: Hearing Tr. 70:2-71:10).

The petitioner called a retired detective, Hal Sherman, who took measurements of the area where the shooting occurred.  (See Sherman: Hearing Tr. 169:19-170:8, 170:20-171:6, 177:20-174:22).  Sherman recorded his measurements in a diagram of the crime scene.  See Diagram of Crime Scene, dated July 13, 2011 (annexed as Ex. 12 to Boyle Exs.).  Based on this

diagram and Sherman's testimony, Holloway was approximately 250 feet from where the shooter chased Johnson, and 275 feet from the sidewalk on which the shooter walked after turning around.  See Pet'r Mem. at 11.

The petitioner also called Diana Almonte, a former girlfriend of the petitioner, who testified that on the night of the shooting, she saw a person in a hoodie point a gun at Johnson. (See Almonte: Hearing Tr. 124:22-24, 126:25-127:3, 135:17-139:25, 164:18-165:18).  Almonte testified that she could not identify that shooter and could not even identify his race or sex, though she said that he was a "little" taller than her (which was 5'1").  (Id. 138:1-24).  Almonte testified that petitioner's family members had come to her house on more than one occasion prior to the hearing and that she felt "harrass[ed]" and "scared" by them.  (Id. 152:15-154:9).  At one point, she agreed that the petitioner "could have been the shooter."  (Id. 163:8-18).

The DA called a detective on the case, retired Detective Sevelie Jones.  (See Jones: Hearing Tr. 303:13-18).  He testified that he spoke to Holloway on the evening of the murder and that she was calm, relaxed, and professional.  (See id. 306:7-309:20).  He recalled preparing the photo array and testified that he never showed Holloway a single photo because he was "never taught that way."  (See id. 309:24-311:22, 313:22-314:13).  He stated "[y]ou put photos in a photo array and you show it to individuals and they select it or not select it, you know." (See id. 314:12-13).  He said that he never suggested to Holloway that she pick out a particular subject.  (See id. 314:14-21).

A former Assistant District Attorney ("ADA"), Brian Sullivan, who prosecuted the case at trial (see Sullivan: Hearing Tr. 400:12-401:18) testified that Holloway was cooperative and pleasant, and that she never expressed any doubts about her identification (Id. 403:18-404:11,

406:18-407:7).  In fact, he testified:

> she told me that she would never forget the guy because it was late at night, she was in her car, he came across in front of her car, in her headlights, and he looked at her and she saw the way he was with his hand, the way he had this hoodie up. She said she thought maybe this guy was going to try to rob her, so she stayed in her car. Then she said she watched him, and she watched him walk down and that is how she saw the shooting.

(see id. 405:7-14).

### 4. Decision on 440.10 Motion

In a 50-page ruling dated June 13, 2014, Justice Richard Lee Price denied Watson's motion to vacate his judgment of conviction.  440.10 Decision at 50.  Throughout the decision, Justice Price noted a number of aspects of Holloway's recantation and testimony that he found improbable or inconsistent.  He noted that Holloway had testified at the hearing that she had not thought about the case from the time of trial until the investigator spoke to her, and that she spoke to him willingly.  Id. at 7-8.  In her statement to the DA, however, she described feeling that she "had to comply" with the defense's wishes and that it was "scary after a while."  Id. at 8 (internal quotation marks and citation omitted).  She had also claimed at one point that she didn't know the outcome of the trial until she met the investigator, yet in her affidavit said she had been "haunted" by what had happened at trial.  Id. at 8-9.  Justice Price found her claim that she was not intimidated by defense investigators "lack[ed] credibility.  Id. at 9.

He noted that her claim that the police had pressured her to identify the defendant was contrary to her claim that she doubted her investigation only after the defense investigator approached her.  Id. at 10.  It also contradicted other hearing testimony that "she always knew there was something wrong with the photo arrays [s]ince the night I looked at it."  Id. (alteration in original) (internal quotation marks and citation omitted).

Justice Price reviewed the testimony of Detective Jones, emphasizing that Jones had not used a suggestive procedure and that Holloway did not express any hesitation in her selection from the photo array. See id. at 12-13. Justice Price noted that Jones did not mention the defendant to Holloway, advise her that the defendant's photograph would appear in the array, disclose to her the existence of other witnesses, or display a single photograph of the defendant to her. Id. at 12-13. He quoted Jones's testimony that he did not do that because "[i]t's not the way it's done. We was [sic] never taught that way. You put the photos in a photo array and you show it to the individuals and they select it or not select it." Id. at 13 (internal quotation marks and citation omitted).

The decision also reviewed the testimony of ADA Sullivan, emphasizing that he had testified that Holloway had always been pleasant and cooperative and that she had not expressed any doubts. Id. at 13.

The decision noted that Almonte had dated the defendant, had remained friends after they broke up, and was in continuing contact with him. Id. at 14. Almonte was present on the night of the murder but she could not provide a description of the shooter. Id. at 15. The decision noted that Almonte had felt intimidated by the defense following the petitioner's arrest. See id. at 15-16.

The decision also included a lengthy review of the testimony of petitioner's trial counsel. See id. at 16-25.

After reviewing the standards applicable to granting a new trial based on newly-discovered evidence, Justice Price found that Holloway had testified at trial in a "detailed, forthright and compelling manner." Id. at 26-29. He noted that her testimony was consistent

15

with her statements to the prosecution prior to trial.  Id. at 29.  He credited ADA Sullivan's testimony that she had been cooperative, had expressed no doubt about the defendant's identity and that "she had carefully watched him."  Id.  The decision emphasized Holloway's "steadfast and unequivocal identification" and its corroboration by other evidence.  Id. at 29-30.

Justice Price found it questionable that Holloway was not merely expressing uncertainty at the hearing but was "unequivocally certain" that petitioner was not the shooter.  Id. at 30-34.  He found "patently unbelievable" and "absurd" Holloway's claim at the hearing that she had a "better memory of what happened that night" than she did in 1991.  Id. at 33-34 (internal quotation marks and citation omitted).  He found it irreconcilable with her testimony that she had not thought about the trial until she spoke with defense investigators.  Id. at 33.

Justice Price found Holloway's "irrational[]" thought processes provided an explanation as to why her testimony was "otherwise equivocal and evasive."  Id.  He noted her changes in demeanor: combative at times at the hearing but "normal" during her 2013 interview with the DA and in her conversations with detectives in 1991.  Id.  He found her claim that she was intimidated during the 2013 interview to be "feigned."  Id. at 35.

Justice Price found that Holloway could not provide any "rational explanation" for her prior inconsistent statements.  Id.  He found that she "fabricat[ed]" the claim that she had been fed information by the detectives in order to make an identification.  Id.  It made no sense, he noted, that she would never have doubted her story if in fact the detectives had so improperly influenced her.  Id. at 35-36.  Justice Price noted again the inconsistency between her claim that she did not realize petitioner was not the shooter until after the defense investigators approached her and her assertions that she had "long been haunted and disturbed about what happened at the

trial" and that she "always knew" the photo arrays were improper.  Id. at 36 (internal quotation marks and citation omitted).

Justice Price found that "[e]ven the circumstances under which Ms. Holloway cooperated with defense investigators lack clarity and credibility."  Id.  He noted that in the 2013 interview, she said she felt she "had to comply" with them but then "defiantly denied" at the hearing that she had so stated, even when she was confronted with the stenographic transcript.  Id. (internal quotation marks and citation omitted).  He concluded that "Ms. Holloway's assertion that she did not feel intimidated by the defense investigators, and only signed the affidavit because it was the truth can hardly be taken seriously let alone believed."  Id.

Justice Price concluded that he "believe[d]" Holloway's trial testimony, and found that she had become "convinced to peddle a concocted story after having been pressured to do so by defense investigators, and an encounter with defendant's family."  Id. at 37.  He found that her recantation had "inherent inconsistency" and that the inconsistency combined with her demeanor, and the existence of corroborating evidence, caused him to "reject her recantation." Id.  He again stated that it was her trial testimony that was "credible."  Id.  He concluded that the defendant had "failed to prove by a preponderance of the evidence that there is a reasonable probability her recantation would result in an acquittal."  Id.  In a separate section, the decision rejected petitioner's claims of ineffective assistance of counsel.  See id. at 38-49.

The Appellate Division denied Watson's motion for leave to appeal on February 3, 2015. See Braun Decl. ¶ 18.

E.  The Instant Petition

On January 4, 2016, Watson sought permission from the United States Court of Appeals for the Second Circuit pursuant to 28 U.S.C. § 2244(b)(3)(A) to file a second habeas corpus petition.  See United States Court of Appeals for the Second Circuit Mandate, filed Feb. 18, 2016 (Docket # 15) ("Mandate"); Motion for an Order Authorizing the District Court to Consider a Successive or Second Habeas Corpus Application, dated Jan. 14, 2016 (attached as Attachment 1 to Mandate) ("Mandate Mot.").  On February 18, 2016, the Second Circuit granted Watson's motion for leave to file a successive § 2254 petition.  See Mandate.  The Second Circuit noted that Watson "made a prima facie showing that he [had] satisfied the successive motion requirements with respect to his proposed claims."  Id.  The Second Circuit directed this Court to determine as a "preliminary" matter, and as required by 28 U.S.C. § 2244(b)(4), "whether the factual predicate for the Petitioner's claims satisfies the requirements of § 2244(b)(2)(B)."  Id. (citing Quezada v. Smith, 624 F.3d 514, 521-22 (2d Cir. 2010)).  We address that issue next.

II.  WHETHER THE FACTUAL PREDICATE FOR WATSON'S CLAIMS SATISFIES 28 U.S.C. § 2244(B)(2)(B)

Under 28 U.S.C. § 2244(b)(3), if a prisoner has already filed a habeas petition, as is true here, the prisoner may file a new habeas petition only with leave from the appropriate court of appeals.  See Quezada, 624 F.3d at 517.  To obtain that permission, the petitioner must make a "prima facie showing that the application satisfies the requirements of" § 2244(b).  Id. at 520 (internal quotation marks and citation omitted).  The Court of Appeals found that Watson made the prima facie showing and thus it granted permission to file the instant petition in this Court. See Mandate.

The statute further provides that once a federal appellate court finds that a petitioner

makes a "prima facie" case that he is entitled to file a successive petition, a district court must

determine whether the petitioner actually satisfies the mandates of § 2244(b)(2), commonly

referred to as the "Gate-Keeping Standards." Quezada, 624 F.3d at 521; 28 U.S.C. § 2244(b)(4).

Only if the district court determines that the requisite factual predicate exists to consider the

successive petition will the court consider the merits of the petition under § 2254. See generally

Quezada, 624 F.3d at 521-22. Indeed, the directive in the statute that the district court determine

whether "the factual predicate for Petitioner's claims satisfies the requirements of

§ 2244(b)(2)(B)" was contained in the Second Circuit's Mandate in this case. See Mandate.

> Section 2244(b)(2)(B) provides that
>
> (2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless . . .
>
>> (B)(I) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>>
>> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2)(B). For purposes of making this determination "the applicant's

allegations are to be accepted as true." Quezada, 624 F.3d at 521.

Here, Watson has established the two requirements of 28 U.S.C. § 2244(b)(2)(B). We

begin by noting that we interpret the word "previously" in 28 U.S.C. § 2244(b)(2)(B) to ask

whether the factual predicate could have been presented in the original petition. Here, the

factual predicate for Watson's claims rests entirely with Holloway's recantation and testimony

regarding alleged police misconduct. Watson has alleged that he did not learn of Holloway's

change of heart until 2011, long after his original petition was filed in 1999. <u>See generally</u> Boyle Decl. ¶¶ 8-9. Watson also has shown that Holloway's recantation "could not have been discovered previously through the exercise of due diligence." 28 U.S.C. § 2244(b)(2)(B)(I). Certainly, there is no evidence that anyone might have thought that Holloway had any testimony favorable to petitioner until she was found. Nor does respondent argue that petitioner did not act diligently in seeking to determine if Holloway had changed her testimony. Thus the first requirement of 28 U.S.C. § 2244(b)(2)(B)(I) has been established.

Whether the second requirement, contained in 28 U.S.C. § 2244(b)(2)(B)(ii), is established is not as clearcut. Here, testimony was admitted that two individuals — Monique James and Robin James — had identified the defendant at a photo-array and at a lineup, although neither sister could make an in-court identification. <u>See</u> Section I.B above. The question thus becomes whether in the absence of Holloway's testimony and looking only at the James sisters' identifications and the other evidence at trial, Watson has shown by "clear and convincing evidence" that "no reasonable factfinder would have found" Watson guilty. 28 U.S.C. § 2244(b)(2)(B)(ii). The lack of an in-court identification from the sisters would certainly be troubling to a jury. Also, notwithstanding these identifications, Monique initially told the police that she "cannot I.D." (Jones: Tr. 730:8), and Robin testified at one point that she did not get a "good" look at the shooter (R. James: Tr. 663:15-17). There was no other evidence identifying the petitioner as the shooter. In light of this dearth of proof, we conclude that Watson has shown by clear and convincing evidence that no reasonable jury would have found him guilty if Holloway's testimony was shown to have been perjurious.

III.  THE STATUTE OF LIMITATIONS DEFENSE

A.  Whether There is a Limitations Period on Second or Successive Petitions

The respondent argues that the petition is untimely.  See Resp't Mem. at 9-14.  Under 28 U.S.C. § 2244(d)(1), a petitioner has a one-year period to file a petition for a writ of habeas corpus challenging a state-court judgment.  The period begins to run from the later of:

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)-(D).

Watson argues that there is no period of limitation for second or successive habeas petitions that have met the requirements of 28 U.S.C. § 2244(b).  See Pet'r Reply at 2.  This argument, however, does not take into account the plain language of § 2244(d), which applies without exception to "an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court."  That § 2244(d) also applies to a second or successive habeas petition is made even more obvious by the fact that one event that triggers the limitations period, the new factual predicate as described in 28 U.S.C. § 2244(d)(1)(D), tracks the very language that appears in the provision governing whether a prisoner can obtain permission to file a second habeas petition at all: namely, whether there is a "factual predicate . . . [that] could not have been

21

discovered previously through the exercise of due diligence," 28 U.S.C. § 2244(b)(2)(B)(I).

Thus, a plain reading of the statute's text establishes that a one-year limitation period applies to

second or successive petitions.  Case law confirms this reading.  See, e.g., Workman v. Bell, 227

F.3d 331, 342 (6th Cir. 2000) ("if a prisoner . . . lets the time run under which he could have

filed his petition, he cannot file a petition beyond the statutory [one-year] time" and the "same

principle applies to the filing of a second or successive petition"); see also Munchinski v.

Wilson, 694 F.3d 308, 325-32 (3d Cir. 2012); Mathis v. Thaler, 616 F.3d 461, 473-76 (5th Cir.

2010); Boykins v. Superintendent Auburn Corr. Facility, 2015 WL 3604030, at *3 (W.D.N.Y.

June 5, 2015); Lynch v. Lord, 2008 WL 10659365, at *2-6 & n.2 (W.D.N.Y. Mar. 25, 2008);

Reyes v. Phillips, 2005 WL 2173812, at *8 (S.D.N.Y. Sept. 6, 2005).  Indeed, Watson cites no

case law to the contrary and the Court is aware of none.

Based on the applicability of the one-year limitations period, the respondent argues, see

Resp't Mem. at 10, that the petition is untimely because the latest that the factual predicate for

Watson's claims could have been discovered was the date of Holloway's affidavit recanting her

testimony, or June 21, 2011.  See Holloway Aff. at *4.[5]  The petition was not filed in this court

until June 28, 2016.  See 2d Pet.  The one-year time period is tolled during the pendency of any

state-court post-conviction collateral review.  28 U.S.C. § 2244(d)(2).  However, Watson did not

---

[5]  Watson does not state on what date in 2011 he or his investigators learned that
Holloway was recanting.  He says only that "[w]itness was not located until 2011."  Mandate
Mot. at 5.  In his memorandum of law in support of the motion, Watson said only that "[i]n 2011
Ms. Holloway was located in Georgia."  See Memorandum of Law in Support of Application for
Permission to File a Second or Successive 28 U.S.C. § 2254 Petition, dated Jan. 13, 2016
(attached as Attachment 2 to Mandate) ("Mandate Mem."), at 3.  This factual question need not
be resolved, however, because the petition is outside the one-year period even if we use the latest
possible date on which petitioner could have discovered Holloway's recanted views — that is,
the date Holloway signed her affidavit, or June 21, 2011.  See Holloway Aff. at *4.

file his § 440.10 motion until July 27, 2012, see Watson 440.10 Mem., more than one year after the latest possible date that "the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D). Thus, by the time his state collateral-review proceeding could have tolled the one-year limitation period, there was no period left to toll because the time period had expired. Case law makes clear that the adjudication of any state-court collateral review does not re-start a new one-year limitation period during which to challenge the underlying conviction. See, e.g., Bethea v. Girdich, 293 F.3d 577, 578 (2d Cir. 2002) (per curiam) ("[P]roper calculation of Section 2244(d)(2)'s tolling provision excludes time during which properly filed state relief applications are pending but does not reset the date from which the one-year statute of limitations begins to run.") (emphasis in original) (internal quotation marks omitted) (quoting Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2000) (per curiam)).[6]

Watson has two responses: (1) that he is entitled to equitable tolling of the limitations period; and (2) that the limitation period can be avoided to avoid a "miscarriage of justice" because Watson is "actually innocent." Pet'r Reply at 2-7. We address each argument next.

---

[6] We note that the fact that the Second Circuit found that Watson had made a prima facie case for filing a successive petition does not mean that the Second Circuit found the petition to be timely. 28 U.S.C. § 2244(b)(3) requires the Court of Appeals to consider only whether a prima facie showing has been made that § 2244(b) has been satisfied, not whether § 2244(d) has been satisfied. See 28 U.S.C. § 2244(b)(3)(C) ("The court of appeals may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection.") (emphasis added). It is the district court's role to determine in the first instance whether the entirety of § 2244 has been satisfied, including the limitation provision contained in § 2244(d). See id. § 2244(b)(4) ("A district court shall dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies this section.") (emphasis added).

B.  Equitable Tolling

Although Watson does not explicitly request to equitably toll the statute of limitations, Watson does argue that he acted diligently in locating Holloway.  Pet'r Reply at 2.  Insofar as diligence is a prong of the equitable tolling analysis, we will treat this argument as a request for equitable tolling.

It is settled that the one-year period of limitation in § 2244(d) may be equitably tolled. Holland v. Florida, 560 U.S. 631, 645 (2010); McGinnis, 208 F.3d at 17; Munchinski, 694 F.3d at 328;  However, "[e]quitable tolling applies only in the rare and exceptional circumstance." McGinnis, 208 F.3d at 17 (internal quotation marks omitted) (quoting Turner v. Johnson, 177 F.3d 390, 391-92 (5th Cir. 1999) (per curiam)).  A petitioner must show that "extraordinary circumstances prevented him from filing his petition on time," and that he acted with "reasonable diligence throughout the period he seeks to toll."  Id. (citing Johnson v. Nyack Hosp., 86 F.3d 8, 12 (2d Cir. 1996)); accord Holland, 560 U.S. at 649 (requiring a petitioner to show that "he has been pursuing his rights diligently" and that "some extraordinary circumstance stood in his way and prevented timely filing") (internal quotation marks omitted) (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)).  The petitioner has the burden of establishing that an extraordinary circumstance prevented him from timely filing, including by "demonstrat[ing] a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing."  Valverde v. Stinson, 224 F.3d 129, 133-34 (2d Cir. 2000).

A court's determination of whether a petitioner has met his burden in establishing a right to equitable tolling is case-specific, see Dillon v. Conway, 642 F.3d 358, 362 (2d Cir. 2011) (per

curiam) (quoting Holland, 560 U.S. at 649-50), and the court should focus on the severity of the circumstance that allegedly prevented timely filing, Diaz v. Kelly, 515 F.3d 149, 154 (2d Cir. 2008). Pro se prisoner status is not by itself a basis for equitable tolling. See McGinnis, 208 F.3d at 18.

Watson has not carried his burden of showing that he is entitled to equitable tolling in this case. Far from the "particularized description" of how his lack of funds affected his ability to timely pursue his rights, see Bolarinwa, 593 F.3d at 232, Watson states only that he needed time for "[a]dditional monies . . . to be raised for legal fees and further investigation." Pet'r Mem. at 3; Boyle Decl. ¶¶ 10-11. In any event, lack of funding is not by itself a sufficient basis for equitable tolling in prisoner cases or otherwise. See Wen Liu v. Mount Sinai Sch. of Med., 2012 WL 4561003, at *5 (S.D.N.Y. Sept. 24, 2012) ("Plaintiff's limited financial means undoubtedly impacted her ability to retain an attorney and pursue this action, [but] it is in no way an extraordinary circumstance that precluded her from timely filing this lawsuit."), aff'd, 559 F. App'x 106 (2d Cir. 2014) (summary order); Guerrier v. Quillian, 2011 WL 4916295, at *3 (S.D.N.Y. Oct. 14, 2011) (refusing to equitably toll a delay that was based in part upon petitioner lacking funds to pay an attorney); Francis v. Miller, 198 F. Supp. 2d 232, 235 (E.D.N.Y. 2002) ("[L]ack[ing] funds . . . [is] not [an] extraordinary circumstance[] that warrant[s] equitable tolling . . . .") (citations omitted). While a court should consider lack of funds in a diligence analysis, lack of funds is not an independent basis for finding an extraordinary circumstance. See Baldayaque v. United States, 338 F.3d 145, 152-53 (2d Cir. 2003) (considering lack of funds in determining whether a petitioner acted diligently during the time period he sought to toll, but not in determining whether an extraordinary circumstance existed); accord Nickels v. Conway,

480 F. App'x 54, 57 (2d Cir. 2012) (summary order).  Thus, we cannot find that Watson's need to obtain additional funds satisfies the strict requirements of equitable tolling.

In his reply memorandum, Watson appears to argue that he acted diligently in locating Holloway, and is thus deserving of equitable tolling.  Pet'r Reply at 2.  But the period at issue is not the period during which he sought to find Holloway.  Rather, it is the period that occurred after Holloway was located.  And, of course, addressing "diligence" is insufficient to allow equitable tolling; "extraordinary circumstances" must also be shown.  <u>Bolarinwa</u>, 593 F.3d at 231; <u>McGinnis</u>, 208 F.3d at 17.  Watson has not shown extraordinary circumstances.

III.  <u>THE ACTUAL INNOCENCE OR MISCARRIAGE OF JUSTICE EXCEPTION</u>

   A.  <u>Governing Legal Principles</u>

Watson argues that he is actually innocent and that this innocence must act as a gateway to avoid the procedural bar reflected in 28 U.S.C. § 2244(d)(1).  Pet'r Reply at 2-3.  Watson argues that <u>McQuiggin v. Perkins</u>, 569 U.S. 383 (2013), permits an "actual innocence" exception to overcome a time-barred petition that can be applied to second or successive petitions brought under 28 U.S.C. § 2244(b)(2).  <u>See</u> Pet'r Reply at 2-3.  Watson also argues that the standard established in <u>Perkins</u> is less demanding than that set out in § 2244(b)(2), and so any petition that satisfies § 2244(b)(2) can never be untimely.  <u>See</u> <u>generally</u> <u>id.</u>  In light of the uncertainty as to whether <u>Perkins</u> applies to second or successive habeas petitions, <u>see</u>, <u>e.g.</u>, <u>United States v. Arbuckle</u>, 2016 WL 1098910, at *8 n.6 (D. Vt. Feb. 16, 2016) (<u>Perkins</u> "indicated that its holding was limited to initial habeas petitions and was not applicable to second or successive petitions"), <u>adopted</u>, 2016 WL 1092604 (D. Vt. Mar. 21, 2016), the Court asked respondent to state its position on this question.  <u>See</u> Order, filed Dec. 23, 2016 (Docket # 49).  Respondent,

however, declined to argue that the statute of limitations would act as a bar in the event that Watson was able to show "actual innocence." See Braun Letter. In light of respondent's position, and since it does not affect the outcome of the case, we will address whether petitioner has met the required showing of "actual innocence."

As noted by the Supreme Court in Perkins, 569 U.S. at 392, a claim of actual innocence may provide an "equitable exception" to the statute of limitations. The exception creates a "gateway" to habeas review notwithstanding the expiration of the statute of limitations. Id. at 386. In such a situation, a petitioner must make the same showing of actual innocence that is required to overcome a procedural bar to habeas review. See id.; House v. Bell, 547 U.S. 518, 536-37 (2006). The standard was articulated in Schlup v. Delo, 513 U.S. 298 (1995). The Second Circuit has summarized the standard as follows:

> To satisfy the Schlup standard, a claim of actual innocence must be both "credible" and "compelling." See House, 547 U.S. at 521, 538, 126 S. Ct. 2064. For the claim to be "credible," it must be supported by "new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." Schlup, 513 U.S. at 324, 115 S. Ct. 851; see also House, 547 U.S. at 537, 126 S. Ct. 2064. For the claim to be "compelling," the petitioner must demonstrate that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt — or[,] to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." House, 547 U.S. at 538, 126 S. Ct. 2064.

Rivas v. Fischer, 687 F.3d 514, 541 (2d Cir. 2012). As the Supreme Court noted in House, "[t]he Schlup standard is demanding and permits review only in the extraordinary case." 547 U.S. at 538 (internal quotation marks and citation omitted). Accordingly, "tenable actual-innocence gateway pleas are rare[.]" Perkins, 569 U.S. at 386.

A separate provision of 28 U.S.C. § 2254 governs our review of this matter. 28 U.S.C.

§ 2254(e)(1) provides that a state court's "determination of a factual issue" is "presumed to be correct," and that presumption may be rebutted only "by clear and convincing evidence." Accord Miller-El v. Dretke, 545 U.S. 231, 240 (2005) (a federal court sitting in habeas is to "presume the [state court's] factual findings to be sound unless [the petitioner] rebuts the 'presumption of correctness by clear and convincing evidence'") (quoting 28 U.S.C. § 2254(e)(1)); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary.").  It is clear from the "plain text" of this statute that this standard applies to a gateway actual innocence claim.  See Jimenez v. Lilley, 2017 WL 4535946, at *8 (S.D.N.Y. Oct. 10, 2017) (citing cases).

B.  Analysis

We begin by noting that the state court found Holloway's recantation testimony to be not credible, see 440.10 Decision at 17, 37, and that this assessment of credibility is presumed to be correct, see 28 U.S.C. § 2254(e)(1); Cotto v. Hebert, 331 F.3d 217, 233 (2d Cir. 2003) (presumption of correctness as to the factual findings by the trial judge under 28 U.S.C. § 2254(e)(1) is "particularly important when reviewing the trial court's assessment of witness credibility"); see also Shabazz v. Artuz, 336 F.3d 154, 163 (2d Cir. 2003) ("Credibility determinations are properly within the province of the state court that presided over the trial and evidentiary hearing."); Smith v. Capra, 2013 WL 6501693, at *9 (S.D.N.Y. Dec. 11, 2013) ("In making this decision under AEDPA, this court must presume correct a trial court's factual findings, including credibility determinations, requiring the petitioner to advance evidence to the contrary.") (citation omitted).  In addition, the presumption can be overcome only by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1); accord Reyes v. Superintendent of Attica Corr.

Facility, 2015 WL 3526093, at *8 (S.D.N.Y. June 2, 2015) ("A state court's factual findings, including credibility determinations, are presumed to be correct and may only be rebutted by clear and convincing evidence"); Mohsin v. Ebert, 626 F. Supp. 2d 280, 303 (E.D.N.Y. 2009) (requiring a federal habeas petitioner to "rebut the presumption" that a state 440.10 decision was "based on a correct finding that [a witness's] recantation was not credible"); see also Smith v. Mann, 173 F.3d 73, 76 (2d Cir. 1999) (presumption of correctness afforded to state-court findings applies to "the credibility of the witnesses narrating" historical facts) (internal quotation marks and citation omitted).

As explained in the Second Circuit case Ortega v. Duncan, finding that a witness's recantation was merely not credible does not necessarily mean that her trial testimony was or was not perjured. 333 F.3d 102, 107 (2d Cir. 2003) (noting that a recantation's "lack of veracity cannot, in and of itself, establish whether testimony given at trial was in fact truthful"). Rather, a reviewing court must look at all "evidence of perjury before it, including but not limited to the recantation." Id.

The justice conducting the 440.10 hearing on Watson's claim wrote a lengthy decision analyzing the issue of whether the evidence provided at the hearing would lead to a "reasonable probability that the defendant would [have been] acquitted." 440.10 Decision at 27. As we have recounted, and as Justice Price noted, there were a number of inconsistencies between Holloway's statement to the DA and what she testified to at the hearing. 440.10 Decision at 8. He also noticed inconsistencies between Holloway's affidavit — which said she had "long been haunted and disturbed" by her participation in Watson's trial, Holloway Aff. ¶ 19 — and her hearing testimony, where she said she had not learned of the trial's outcome until Watson's

investigator approached her (see Holloway: Hearing Tr. 58:21-59:14). See 440.10 Decision at 8-9. He noted that while the basis of her affidavit and recantation was purported police misconduct in causing her to identify a person she did not see and that her trial testimony was a knowing lie (see Holloway: Hearing Tr. 107:20-109:8, 110:3-8), Holloway claimed that she first began to doubt her trial testimony only after being approached by the defense investigator (see id. 81:8-14). See 440.10 Decision at 10. Further, Holloway claimed she "always knew there was something wrong with the photo arrays." (Holloway: Hearing Tr. 94:22-24). Justice Price specifically noted this inconsistency. 440.10 Decision at 10, 36.

Justice Price also considered Holloway's original trial testimony in the context of all the surrounding evidence before him, including Holloway's later recantation. 440.10 Decision at 28-34. Justice Price noted that Holloway's identification was corroborated by Monique and Robin James. See id. at 30. Holloway's claim that she had a better memory of the events in 1991 at the hearing than she did in 1991 was "patently unbelievable" to Justice Price. Id. at 33. Justice Price found her hearing testimony "equivocal and evasive." Id. at 34. Further, Justice Price noticed that Holloway was "visibly exasperated" when directly confronted about her inconsistencies at the hearing. Id. Notably, Holloway agreed in the statement that "everything" that she testified to at trial was the truth as she remembered it. Holloway Statement 69:14-16. On cross-examination at the hearing, Holloway again claimed that the testimony she gave at trial was "the truth as [she knew] it at the time." (See Holloway: Hearing Tr. 69:8).

Justice Price further found troubling the fact that Holloway never sufficiently explained her reaction to her being contacted by the defense investigator. See 440.10 Decision at 36. Noting that Holloway claimed in her statement to the DA that she had felt pressured and even

"scar[ed]" into complying with the defense investigator's questions, see, e.g., Holloway Statement 36:16-24, 73:23-74:14, Justice Price found that Holloway never provided a "coherent explanation that such pressure and intimidation did not factor in her signing the recantation affidavit," 440.10 Decision at 36. He noted that she had denied even making those statements. Id. Indeed, when confronted with her own statements that she felt scared, Justice Price noted Holloway "grew impatient and sarcastic[]." Id. Justice Price found that "Holloway's assertion that she did not feel intimidated by the defense investigators . . . can hardly be taken seriously[,] let alone believed." Id.

Justice Price found that Holloway's testimony was inherently inconsistent, that Holloway was "elusive and combative" at her hearing, and that sufficient corroborating eyewitness testimony and physical evidence supported Holloway's trial testimony. Id. at 37. He found that Holloway had not "meaningfully refute[d] [her] credible trial testimony." Id.

Watson urges this Court to reject the state court's hearing determination. See Pet'r Mem. at 36. Watson's main contention is that Justice Price focused exclusively on the reliability of Holloway's recantation without focusing on other evidence suggestive of perjury at trial. See id. at 19.

Watson argues that Holloway's recantation testimony that she could not see the shooter because his hoody was drawn so close to his face was corroborated by testifying witness Diana Almonte. See id. at 20-21. Almonte testified at the hearing that she could not see the shooter's face because of his hoody. (Almonte: Hearing Tr. 138:7-139:3). Justice Price did consider Almonte's testimony, however, and noted, correctly, that she testified that she had so little ability to see the shooter's face that even Watson "could have been the shooter." 440.10

Decision at 43 (citing Almonte: Hearing Tr. 162-163). More importantly, Almonte's view of the shooter right before the killing and Holloway's view of him passing in front of his car occurred at different points in time and from different vantage points.

Watson alleges that Justice Price "misstated the record" by claiming that Almonte "could not provide a description" to the police. Pet'r Mem. at 21; see 440.10 Decision at 15. Watson correctly notes that Almonte did indeed give a description to the detectives (see Jones: Hearing Tr. 326:15-327:24), but that description did not include a description of the shooter's face. Indeed, it was clear that Justice Price understood this distinction. See 440.10 Decision at 15 ("[Almonte] told [detectives] that she was unable to see the man's face. As such, Ms. Almonte could not provide a description."). Additionally, while Watson points out that Almonte testified that "nothing about the shooter brought to mind Shane Watson," Pet'r Mem. at 21 (citing Almonte: Hearing Tr. 143, 164), she also testified that Watson "could have been" the shooter (Almonte: Hearing Tr. 163:8-18). We thus do not believe that Justice Price's description of Almonte's testimony casts doubt on his factual findings.

Watson correctly points to Ortega for the proposition that a trial court should not rest solely on a witness's incredible recantation to determine whether that witness's trial testimony was truthful. Pet'r Mem. at 18-19 (citing Ortega, 333 F.3d at 107). However, in Ortega there was another witness who directly contradicted whether the recanting witness was even physically present for the events he claimed he saw as well as proof of other perjurious statements by the recanting witness related to the case. 333 F.3d at 105, 107. There is no such evidence here. The only evidence that Holloway incorrectly identified Watson at the 1993 trial is her own recantation. Thus, focusing on the credibility of Holloway's testimony was the

proper analysis for the hearing judge. Additionally, unlike this case, <u>Ortega</u> dealt with a situation where the state court "explicitly refused to make a finding on the credibility" of the recanting witness. <u>Id.</u> at 105.

Watson also claims that Holloway's recantation and claim of perjury was supported by the physical layout of the crime scene as indicated by Sherman's hearing testimony. (<u>See</u> Sherman: Hearing Tr. 170:11-186:22). Watson claims that Sherman's measurements of the parking lot corroborate that Holloway was "about 250 feet" away from where the shooter chased the victim in 1991 and "over 275 feet from" the shooter when he walked away after the shooting. Pet'r Mem. at 23-24. Moreover, "since she parked head-in," Holloway would have had to "crane her neck" to see the shooter running after the shooting. <u>Id.</u> at 24. Watson argues that, based on Holloway's hearing testimony, at one point, it would have been impossible for Holloway to have seen the face of the shooter. <u>See id.</u> at 24. This argument, however, assumes that Holloway's testimony at the hearing was truthful and accurate as to her car's position in the parking lot. While the testimony at the hearing undercut Holloway's original estimate as to the distance between her and the shooter the second time she saw him, we do not believe that the omission of a discussion of this testimony casts doubt on Justice Price's findings. And, of course, Holloway's trial testimony was that the closest view she had of the shooter was at the moment he first passed by her car. (<u>See</u> Holloway: Tr: 544:21-545:16). The testimony at the hearing did not undercut the trial testimony regarding the distance between Holloway and the individual who passed in front of her car.

Watson also points to several instances where he asserts Justice Price misinterpreted Holloway's testimony. For instance, Watson claims Justice Price erred in finding that Holloway

began to doubt her trial testimony only after being approached by defense investigators, when in fact Holloway had long felt uncertain of her identification; in finding that ideas of trial error were first placed in her mind by defense attorneys; and by ignoring Holloway's unwillingness to express her doubts to the DA.  See Pet'r Mem. at 26-28.  But Holloway gave conflicting testimony on even these points.  Thus, Holloway claimed she doubted her trial testimony shortly after the 1991 trial.  Holloway Statement 13:1-24.  But she also agreed that she began developing doubts "only after" it was constantly brought up to her, see id. 70:24-71:10, and that she had "moved on" after 20 years, id. 12:14-25.  Holloway claimed that any ideas about the suggestibility of her identification was prompted by her conversations with defense attorneys (see id. 39:16-41:23), and she also stated the defense pressure made her begin to question her identification, though she initially stood by it, see id. 71:15-73:21.  Holloway testified that she was worried about expressing doubts to the DA (Holloway: Hearing Tr. 120:1-121:5), but also conceded that she told the DA in 2013 that she stood by her identification and that she picked out the shooter that she recognized (see id. 103:16-105:1).  Justice Price could properly conclude that Holloway's conflicting testimony demonstrated her unreliability as a witness.

Watson alleges that prosecutors "badger[ed]" Holloway during her 2013 interview with the DA, and that this intimidation was missed by Justice Price.  Pet'r Mem. at 31.  Watson references several "lecture[s]" and "chastise[ments]" from the prosecution to essentially goad Holloway into giving the answers they wanted.  Id. at 31-32.  To the extent that Watson is attacking Justice Price's credibility determination based on his failure to reference this claim, his decision in fact references it.  See 440.10 Decision at 35 (noting that Holloway considered the prosecutors to be "aggressive").  In any event, Justice Price could properly construe the

transcript of the statement in light of the testimony of the court reporter, who testified at the hearing that Holloway's demeanor was normal and that the prosecutors at the meeting did not raise their voices. (See Perez: Hearing Tr. 386:16-388:8).

Watson argues that Justice Price erred in not referencing the trial testimony of Marguerite Martin, a witness who testified at the 1993 trial that Holloway "told her that she was unsure of her identification but had to stick with it because she had been pressured by the police." Pet'r Mem. at 25. Martin did testify at trial and did say that Holloway told her that "[s]he heard shots. A man ran past her car with a hood on his head. She could not see his face." (Martin: Tr. 792:23-24). Martin also claimed that, while discussing the case, Holloway felt that "the police were harassing her to be a witness." (Id. 793:16-19). But Martin's account was not only inconsistent with Holloway's trial testimony, but also with Holloway's statement to the DA. When asked in 2013 by prosecutors whether she told "anybody that [she was] acquaintances with . . . about what was happening with this case," Holloway said "[h]ell no. And put that down in capit[al] letters." Holloway Statement 88:10-15. We do not believe the omission of a discussion of Martin's testimony alters the deference owed to Justice Price's credibility findings.

Watson attacks Justice Price's crediting of Detective Jones's testimony that he did not tell Holloway about any other eyewitnesses. See Pet'r Mem. at 26. Detective Jones testified that he would not have suggested to Holloway that anyone in the photo array was the suspect. (See Jones: Hearing Tr. 312:1-20). Detective Jones also denied showing Holloway an individual photo, or any other photograph, before showing her the array. (Id. 313:22-314:13). To attack this testimony Watson points to the fact that Watson was placed in the "# 1" position in two of the photo arrays. Pet'r Mem. at 33-34. Justice Price could choose to accept, however, Jones's

testimony there was no "rhyme or reason" to putting Watson in that position in both arrays. (Jones: Hearing Tr. 311:7-22). Watson also points to what amount to inconsistencies between Jones's recollection at the 2013 hearing of Holloway's conduct in 1991. See Pet'r Mem. at 34-35. But such inconsistencies could easily be attributable to minor errors of memory resulting from a lapse of 22 years that did not otherwise undermine his testimony as to other more critical matters. Similarly, we do not view petitioner's argument that Jones did not use proper procedures in presenting photo arrays to the James sisters, see id. at 35, as detracting from Justice Price's assessment of Jones's overall credibility.

Watson argues, Pet'r Mem. at 26, that there was evidence that Jones was untruthful because (1) Holloway testified at the hearing that Detective Jones told her about other witnesses in an effort to apparently ease her concerns about making a false identification (see Holloway: Hearing Tr. 41:19-42:11); and (2) Detective Jones showed Holloway the photo array after he obtained an identification from one of the James sisters (see Jones: Hearing Tr. 354:19-356:17, 360:16-24). Watson argues that Jones must have told Holloway about the other witnesses because she would have had no other way of knowing about them. Pet'r Mem. at 26. We reject this argument because it assumes that Holloway's recantation testimony is necessarily accurate. Additionally, just because Detective Jones interviewed Holloway shortly after another eyewitness in 1991 does not mean that Jones told her about other witnesses. Obviously, Holloway could have easily become aware at the time of the trial (not to mention during the process of preparing for the hearing) that the James sisters had identified the petitioner, as this was the subject of public testimony. Justice Price could accept Detective Jones's testimony that he did not show Holloway an individual photo, or any other photograph, before showing her the

array (see Jones: Hearing Tr. 313:22-314:13), and his testimony that he did not tell Holloway about any other eyewitness (see id. 315:3-5).

Of course, there was much contradictory evidence from Holloway on this point. Contrary to the statement in her affidavit that she was shown a single photograph of the petitioner prior to being shown the photo array, Holloway Aff. ¶ 12, at her session before the DA, Holloway did not recall ever being shown a single photograph, Holloway Statement 59:25-60:19. Also, contrary to her statement in the affidavit that a detective identified the petitioner as the perpetrator before she made her identification, Holloway Aff. ¶ 12, at the session with the DA she stated only that a detective said "we know who it was," Holloway Statement 17:6-7, and she could not recall whether that occurred before she looked at "a picture" (presumably referring to the photo array since she did not state that she had been shown a single photograph), id. 17:8-19. She also stated that she did not let the detective influence her. Id. 19:24-20:8.

\* \* \*

A New York State Supreme Court Justice heard all the evidence on this question and concluded that Holloway's recantation of her testimony was not credible and that her trial testimony was in fact "credible." 440.10 Decision at 37. We do not have the authority to conduct a de novo review of the record and reach our own conclusion as to whether Holloway's recantation was credible. Rather, we are bound to overturn that finding only if there is "clear and convincing" evidence to support doing so. We cannot make that finding here. In light of the absence of any other significant evidence showing that Holloway's trial testimony was untruthful, we cannot find that the evidence of actual innocence is supported by "new reliable evidence" such as a "trustworthy eyewitness account[]," Schlup, 513 U.S. at 324, or that it is

37

more likely than not that "any reasonable juror would have reasonable doubt" about Watson's innocence, <u>House</u>, 547 U.S. at 538. [7]

IV.  <u>CONCLUSION</u>

    For the foregoing reasons, Watson's second petition for a writ of habeas corpus (Docket # 28) should be denied.

    We recognize that this case presents difficult questions and it is possible that with the application of a different standard of review as to our consideration of the state court opinion, the result might have been different.  Accordingly, it is recommended that in the event the petition is denied, a certificate of appealability issue pursuant to 28 U.S.C. § 2253(c).  <u>See</u> <u>Buck v. Davis</u>, 137 S. Ct. 759, 774 (2017) (a certificate of appealability should issue where the decision reached by the district court is "debatable").

**<u>PROCEDURE FOR FILING OBJECTIONS TO THIS
REPORT AND RECOMMENDATION</u>**

    Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file any objections.  <u>See</u> <u>also</u> Fed. R. Civ. P. 6(a), (b), (d). A party may respond to any objections within 14 days after being served.  Any objections and responses shall be filed with the Clerk of the Court, with copies sent to the Hon. Paul A. Engelmayer at 40 Foley Square, New York, New York 10007.  Any request for an extension of time to file objections or responses must be directed to Judge Engelmayer.  If a party fails to file

---

[7]  We note that while we have found that the petition is dismissable based on the statute of limitations defense raised by the respondent, the same result would occur if the petition were considered on the merits given that petitioner's three constitutional claims depend entirely on the credibility of Holloway's recantation.

timely objections, that party will not be permitted to raise any objections to this Report and

Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP

v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir.

2010).

Dated: January 30, 2018
     New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge