UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

SHANE WATSON,

                         Petitioner,

          -v-

CHRISTOPHER ARTUZ, Superintendent, Greenhaven
Correctional Facility,

                        Respondent.

------------------------------------------------------------------X

99 Civ. 1364 (PAE) (GWG)

OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/21/19

PAUL A. ENGELMAYER, District Judge:

Petitioner Shane Watson was convicted in 1992 of second-degree murder and recently

finished serving the prison component of his sentence. This case arises from the recantation of

an eyewitness to the murder who had testified at Watson's trial. Largely on the basis of that

recantation, Watson brought a motion in New York state court in 2012, pursuant to New York

Criminal Procedure Law § 440.10, to vacate the 1992 conviction. After the § 440.10 motion was

denied and the New York State Appellate Division (First Department) denied leave to appeal,

Watson brought this petition for a writ of habeas corpus under 28 U.S.C. § 2244(b)(2)(B),

seeking vacatur of his conviction for constitutional errors stemming from substantially the same

evidence as that before the § 440.10 court. Dkt. 28.

Before this Court now is the January 30, 2018 Report and Recommendation of Magistrate

Judge Gabriel W. Gorenstein (the "Report"). The Report recommends that the Court deny

Watson's petition as untimely. It does so because, the Report concludes, Watson has not made a

"credible" and "compelling" showing of actual innocence, as required under *Schlup v. Delo*, 513

U.S. 298 (1995), and *House v. Bell*, 547 U.S. 518 (2006), to supply a gateway around the

statutory time limit that would otherwise bar Watson's petition. Dkt. 53. Both Watson and Respondent filed objections to the Report. *See* Dkt. 56 ("Resp't Obj."); Dkt. 57 ("Pet'r Obj.").

On December 19, 2018, the Court, on its initiative, heard live testimony of the recanting witness, Christine Holloway. The Court did so to assess Watson's claim of actual innocence. Watson and Respondent each then filed letters assessing that testimony. *See* Dkts. 67, 68.

For the reasons below, the Court adopts the conclusion of—and, with limited exceptions, the analysis in—Judge Gorenstein's thoughtful, perceptive, and thorough Report. Consistent with the Report's recommendation, the Court denies Watson's petition as untimely.

## I.      Background

### A.      Facts

The Court adopts the Report's detailed account of the facts, to which no party objects. The following summary captures only the limited facts necessary to discuss the issues presented.

#### 1.      Watson's Trial and Holloway's Testimony

On October 13, 1992, after a jury trial, Watson was convicted for the murder of Mark Johnson. Watson was sentenced to 25 years to life in prison.

Johnson was shot and killed on a Bronx street on the night of October 9, 1991. At trial, Holloway testified that, just before the shooting, she had been waiting in her building's parking lot for her husband to drop off her children. Holloway testified that she had seen, from an unobstructed and well-lit view about five feet away, a man in a hoodie walk past her car. The man, she testified, had an angry expression. Soon after, Holloway testified, she heard a gunshot and looked up. She saw the person who had walked in front of her car chasing Johnson. Holloway testified that she saw the shooter several times: The shooter chased Johnson around a building and then returned to her line of sight. Holloway was interviewed by police immediately

after the shooting. Holloway picked Watson out of frontal and profile photo arrays that night, and later out of an in-person line-up.

At trial, three prosecution witnesses identified Watson in connection with these events. Holloway was the only one to attest to having witnessed the actual shooting. In addition to her in-court identification of Watson as the shooter, Holloway's earlier, out-of-court identifications were received in evidence. At trial, asked whether she had any doubt about her identification of Watson, Holloway answered "no."

The other two eyewitnesses were sisters Robin and Monique James. They testified to having heard gunshots outside their window and having looked outside to see the fleeing shooter. Neither Robin nor Monique made an in-court identification at trial. However, for each, an out-of-court identification made shortly after the shooting was received. Robin identified Watson from a frontal photo array; she was not offered a profile array. Monique identified Watson from a profile array but could not positively identify him from a frontal array.

### 2. Watson's Appeal and First Federal Habeas Petition

Watson appealed his convictions, raising issues including challenges to jury selection, to the trial judge's refusal to question a juror post-verdict, and to the scope of the cross-examination he was permitted to make of Holloway. The Appellate Division affirmed the conviction. *People v. Watson*, 243 A.D.2d 426, 426 (1st Dep't 1997). The New York Court of Appeals denied Watson's request for leave to appeal. *People v. Watson*, 92 N.Y.2d 863 (1998).

On February 23, 1999, Watson filed a pro se petition for a writ of habeas corpus in this District, arguing that the trial judge improperly limited cross-examination of Holloway and denied his post-trial motion for an evidentiary hearing into a juror's post-verdict statement, both in violation of his Sixth Amendment rights. *See Watson v. Artuz*, No. 99 Civ. 1364 (SAS), 1999 WL 1075973, at *3 (S.D.N.Y. Nov. 30, 1999). On November 30, 1999, Judge Scheindlin denied

3

Watson's petition, finding that he had not made a clear showing of a denial of a substantial constitutional right. *Id.* at *7. On December 30, 1999, Watson appealed that denial. Dkt. 12. On September 12, 2000, the Second Circuit dismissed Watson's appeal. Dkt. 14.

### 3. Watson's § 440.10 Motion Based On the 2011 Interview of Holloway

In 2009, about 10 years after the denial of his first federal habeas petition, Watson retained attorney Robert J. Boyle, Esq., to review his case. In 2011, an investigator working with Boyle located Holloway in Atlanta, Georgia. Boyle traveled to Atlanta, interviewed Holloway, and obtained an affidavit from her dated June 21, 2011. In it, Holloway stated that she had not in fact seen the shooter clearly enough to make an identification, and that she had identified Watson as a result of pressure from the police. She also alleged that the officers had first shown her a single photo of Watson and then encouraged her to identify him in the photo arrays and at trial as a means of removing a "bad man" from the streets. Holloway stated that the officers had told her that her testimony was likely to be credited because of her law enforcement job at the time—as a state correctional officer.

On July 27, 2012, Boyle filed a motion under New York Criminal Procedure Law § 440.10 seeking to vacate Watson's conviction. The motion was largely based on Holloway's affidavit. It argued, *inter alia*, that the conviction should be overturned because Holloway's trial testimony had been false, that the prosecution should have known that it was false, and that the prosecution had engaged in misconduct by knowingly using Holloway's perjured testimony.

### 4. The District Attorney's Interview of Holloway

The Bronx District Attorney's Office (the "DA") flew Holloway to New York and, on January 24, 2013, interviewed her. In that interview, Holloway repudiated the affidavit that Boyle's investigator had obtained from her. Holloway stated that she had seen the shooter's face

clearly, that she was confident in her accuracy when she had picked Watson out of the photo array, and that she had later stated that she doubted her selection from the array only because the investigator had brought it up so many times. Holloway further stated that repeated visits by the defense investigator had made her nervous. Holloway also denied that the police had ever shown her a single photograph of Watson. And, she stated, although the officers had told her that "we know who it was," that statement had not influenced her. Most important, Holloway stated that her trial testimony had been truthful.

### 5. Hearings on the § 440.10 Motion

Evidentiary hearings on Watson's § 440.10 motion were held on various dates between July and October 2013. At these hearings, Holloway largely recanted her trial testimony and testified generally consistent with the affidavit she had given Boyle's investigator and inconsistent with her later statement to the DA. She claimed that she had not learned the outcome of Watson's trial until the investigator approached her in Atlanta, and that, afterwards, she had begun to doubt her testimony. Holloway testified that the officers had shown her a single photo of Watson and suggested that he was the shooter. She testified that she had been distracted and suggestible on the night of the murder because, earlier that night, she had signed a "Do Not Resuscitate" order for her brother in the hospital. Holloway testified that she had picked Watson out of the photo array because the officers had shown her Watson's photograph. Holloway explained the inconsistencies between her affidavit and the statements she had made in her interview with the DA on the ground that she had felt intimidated by the DA.

On cross-examination, however, Holloway stated that the testimony she had given at trial was "the truth as [she knew] it at the time." And other witnesses at the hearing testified so as to substantiate Holloway's credibility at trial. Among others, a retired detective, Sevelie Jones,

5

testified that he had spoken with Holloway on the evening of the murder and that she had been calm, relaxed, and professional; that he had prepared the photo array; and that he had not shown Holloway a single photograph or suggested that she pick out a particular subject. The former ADA who prosecuted the case testified that Holloway had been cooperative and pleasant and had never expressed any doubts about her identification.

### 6. Decision on the § 440.10 Motion

On June 13, 2014, Justice Richard Lee Price, the state court judge presiding over the § 440.10 hearings, issued a 50-page decision denying Watson's motion to vacate his 1992 judgment of conviction. Carefully reviewing Holloway's testimony, Justice Price, throughout his decision, noted aspects of Holloway's recantation and testimony that he found incredible. As summarized later by Judge Gorenstein:

> [Justice Price] noted that Holloway had testified at the hearing that she had not thought about the case from the time of trial until the investigator spoke to her, and that she spoke to him willingly. In her statement to the DA, however, she described feeling that she "had to comply" with the defense's wishes and that it was "scary after a while." She had also claimed at one point that she didn't know the outcome of the trial until she met the investigator, yet in her affidavit said she had been 'haunted' by what had happened at trial. Justice Price found her claim that she was not intimidated by defense investigators "lack[ed] credibility.["]

> He noted that her claim that the police had pressured her to identify the defendant was contrary to her claim that she doubted her investigation only after the defense investigator approached her. It also contradicted other hearing testimony that "she always knew there was something wrong with the photo arrays [s]ince the night I looked at it."

> Justice Price reviewed the testimony of Detective Jones, emphasizing that Jones had not used a suggestive procedure and that Holloway did not express any hesitation in her selection from the photo array. Justice Price noted that Jones did not mention the defendant to Holloway, advise her that the defendant's photograph would appear in the array, disclose to her the existence of other witnesses, or display a single photograph of the defendant to her. He quoted Jones's testimony that he did not do that because "[i]t's not the way it's done. We was [sic] never taught that way. You put the photos in a photo array and you show it to the individuals and they select it or not select it."

6

Report at 14–15 (quoting Justice Price's decision; citations omitted; alterations in quoted language in Report). As Judge Gorenstein further summarized Justice Price's decision:

> After reviewing the standards applicable to granting a new trial based on newly-discovered evidence, Justice Price found that Holloway had testified at trial in a "detailed, forthright and compelling manner." He noted that her testimony was consistent with her statements to the prosecution prior to trial. He credited ADA Sullivan's testimony that she had been cooperative, had expressed no doubt about the defendant's identity and that "she had carefully watched him." The decision emphasized Holloway's "steadfast and unequivocal identification" and its corroboration by other evidence.
>
> Justice Price found it questionable that Holloway was not merely expressing uncertainty at the hearing but was "unequivocally certain" that petitioner was not the shooter. He found "patently unbelievable" and "absurd" Holloway's claim at the hearing that she had a "better memory that night" than she did in 1991. He found it irreconcilable with her testimony that she had not thought about the trial until she spoke with defense investigators.
>
> Justice Price found Holloway's "irrational[]" thought processes provided an explanation as to why her testimony was "otherwise equivocal and evasive." He noted her changes in demeanor: combative at times during the hearing but "normal" during her 2013 interview with the DA and in her conversations with detectives in 1991. He found her claim that she was intimidated during the 2013 interview to be "feigned."
>
> Justice Price found that Holloway could not provide any "rational explanation" for her prior inconsistent statements. He found that she "fabricat[ed]" the claim that she had been fed information by the detectives in order to make an identification. It made no sense, he noted, that she would never have doubted her story if in fact the detectives had so improperly influenced her. Justice Price noted again the inconsistency between her claim that she did not realize petitioner was not the shooter until after the defense investigators approached her and her assertions that she had "long been haunted and disturbed about what happened at the trial" and that she "always knew" the photo arrays were improper.
>
> Justice Price found that "[e]ven the circumstances under which Ms. Holloway cooperated with defense investigators lack clarity and credibility." He noted that in the 2013 interview, she said she felt she "had to comply" with them but then "defiantly denied" at the hearing that she had so stated, even when she was confronted with the stenographic transcript. He concluded that "Ms. Holloway's assertion that she did not feel intimidated by the defense investigators, and only signed the affidavit because it was the truth can hardly be taken seriously let alone believed."

Justice Price concluded that he "believe[d]" Holloway's trial testimony, and found that she had become "convinced to peddle a concocted story after having been pressured to do so by defense investigators, and an encounter with defendant's family." He found that her recantation had "inherent inconsistency" and that the inconsistency combined with her demeanor, and the existence of corroborating evidence, caused him to "reject her recantation." He again stated that it was her trial testimony that was "credible." He concluded that the defendant had "failed to prove by a preponderance of the evidence that there is a reasonable probability her recantation would result in an acquittal."

Report at 15–17 (quoting Justice Price's decision; citations omitted; alterations in quoted language in Report). On February 3, 2015, the Appellate Division denied Watson's motion for leave to appeal.

## B.   The Instant Petition

On January 4, 2016, Watson moved before the United States Court of Appeals for the Second Circuit for leave to file a successive § 2254 petition. Dkt. 15-2. On February 18, 2016, the Second Circuit granted leave, finding that Watson had made a prima facie showing under 28 U.S.C. § 2244(b)(3)(C) that he satisfied the requirements for a successive habeas petition. It directed the District Court to address whether the factual predicate for Watson's claims satisfied § 2244(b)(2)(B). Dkt. 15. On May 3, 2016, the case was reassigned from Judge Scheindlin to this Court. *See* Dkt. 23.

On June 28, 2016, Watson filed an Amended Petition. Dkt. 28 ("Am. Pet."). On July 27, 2016, the Court referred the case to Judge Gorenstein for a Report and Recommendation. Dkt. 34. On September 27, 2016, Respondent responded to the Amended Petition. Dkt. 42. On December 12, 2016, Watson replied. Dkt. 47.

On December 23, 2016, Judge Gorenstein solicited Respondent's view on how the "actual innocence" exception to 28 U.S.C. § 2244(d)(1)'s statute of limitations applies to a

successive habeas petition brought under 28 U.S.C. 2244(b)(2)(B). Dkt. 49. Respondent submitted a letter. Dkts. 50. On January 17, 2017, Watson responded. Dkt. 51.

### C.     Judge Gorenstein's Report and Recommendation

On January 30, 2018, Judge Gorenstein issued the Report, recommending denial of Watson's petition. The Report is summarized in detail below. On February 13, 2018, Respondent filed its objections. Dkt. 56. On March 30, 2018, Watson filed his objections. Dkt. 57.

### D.     Holloway's Testimony Before This Court

On September 17, 2018, the Court issued an Order expressing its intention to hold a hearing at which it would hear Holloway's testimony. Dkt. 58. On September 28, 2018, the Court scheduled the hearing for December 19, 2018. Dkt. 60. That day, the Court heard Holloway's testimony. She was examined by counsel for both Watson and Respondent; Watson was present. On January 4, 2019, at the Court's invitation, the parties filed letters addressing whether Holloway's recantation was credible and whether her testimony supplied clear and convincing evidence sufficient to overcome Justice Price's contrary finding. Dkts. 67, 68.

## II.     Discussion

### A.     Standards of Review

#### 1.     Report and Recommendation from a Magistrate Judge

After a magistrate judge has issued a Report and Recommendation, a district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). To accept the portions of a report to which no timely objection has been made, "a district court need only satisfy itself that there is no clear error on the face of the record." *Acevedo v. Lempke*, No. 10 Civ. 5285 (PAE) (HBP), 2014 WL 4651904, at *3 (S.D.N.Y. Sept. 17, 2014) (quoting *King v. Greiner*, No. 02 Civ. 5810 (DLC), 2009 WL

2001439, at *4 (S.D.N.Y. July 8, 2009)). When a timely and specific objection has been made, the court is obligated to review the contested issues *de novo*. *See id.*; *see also* Fed. R. Civ. P. 72(b)(3); *Hynes v. Squillace*, 143 F.3d 653, 656 (2d Cir. 1998). But when the objections simply reiterate previous arguments or make only conclusory statements, the court should review the report for clear error. *Dickerson v. Conway*, No. 08 Civ. 8024 (PAE) (FM), 2013 WL 3199094, at *1 (S.D.N.Y. June 25, 2013); *see also Kirk v. Burge*, 646 F. Supp. 2d 534, 538 (S.D.N.Y. 2009) (collecting cases).

### 2. Standards Governing a Successive Habeas Petition

This case involves a successive habeas petition. Although the Amended Petition styles itself as seeking "*habeas* review of an order of the Supreme Court of the State of New York, Appellate Division, First Department, dated February 3, 2015 that denied leave to appeal an order of the Supreme Court, Bronx County (Price, J.) dated June 13, 2014 denying his motion to vacate a judgment of conviction pursuant to N.Y.C.P.L. § 440.10," Am. Pet. at 1, it is more properly considered a review of the original 1992 state court conviction, which it seeks to vacate.

Because Watson previously filed a federal habeas petition to vacate that conviction on other grounds, *see* Dkt. 2, this habeas petition is governed by 28 U.S.C. § 2244, which concerns successive habeas petitions. Watson brings this petition under § 2244(b)(2)(B), which provides

> [a] claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless—
>
> . . .
>
> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

10

28 U.S.C. § 2244(b)(2)(B). Before the Court considers the merits of Watson's claims, he must meet this threshold standard.

Additionally, a successive habeas petition is governed by § 2244(d)(1), which sets the following limitations period:

> [a] 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of . . .
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). Neither party at this stage disputes Judge Gorenstein's finding that Watson's successive habeas petition would be untimely as outside § 2244(d)(1)'s one-year statute of limitations unless either equitably tolled or subject to the actual innocence exception articulated in *Schlup*, 513 U.S. at 327.

A key standard here is therefore that governing this actual innocence "gateway." Under this exception, a successive habeas petition overcomes its untimeliness where

> a claim of actual innocence [is] both "credible" and "compelling." *See House*, 547 U.S. at 521. For the claim to be "credible," it must be supported by "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324; *see also House*, 547 U.S. at 537. For the claim to be "compelling," the petitioner must demonstrate that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538.

*Rivas v. Fischer*, 687 F.3d 514, 541 (2d Cir. 2012). A habeas court

> must consider "'all the evidence,'" old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under "rules of admissibility that would govern at trial." *See* [*Schlup*, 513 U.S.] at 327–328 (quoting Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 160 (1970)). Based on this total record, the court must make "a probabilistic determination about what reasonable, properly

instructed jurors would do." 513 U.S., at 329 . . . . The court's function is not to make an independent factual determination about what likely occurred but rather to assess the likely impact of the evidence on reasonable jurors. *Ibid.*

*House*, 547 U.S. at 538.

The Court's role here is to make such an assessment. Justice Price's resolution of the § 440.10 motion that Watson brought to vacate his conviction, based on substantially the same evidence as here (Holloway's recantation), is important background to the Court's review. It is part of the record this Court must consider in evaluating how a reasonable jury would assess the "total record," including the trial evidence and new evidence. As developed below, this Court, like Judge Gorenstein, found Justice Price's analysis, informed by his firsthand exposure to a number of consequential witnesses, perceptive and persuasive.

### B.    Judge Gorenstein's Report and Recommendation

Judge Gorenstein first reviewed, at length, the trial record, Watson's direct appeal, his first habeas petition, and the evidence presented on the § 440.10 motion.

In his legal analysis, Judge Gorenstein began by evaluating whether Watson satisfied the gate-keeping requirements of 28 U.S.C. § 2244(b)(2) for a successive habeas petition. Report at 18. He found that Watson's petition met both § 2244(b)(2)(B) requirements. First, the factual predicate (Holloway's recantation) could not have been discovered earlier through due diligence, as Watson did not learn of it until 2011. Report at 19–20. The second requirement—whether the new facts, if proven, would establish by clear and convincing evidence that no reasonable factfinder would have found Watson guilty—presented a closer call. *Id.* at 20. However, Judge Gorenstein noted, because Holloway had been the only eyewitness to identify Watson at trial, the "lack of an in-court identification from the [James] sisters would certainly be troubling to a jury." *Id.* And notwithstanding the James sisters' identifications of Watson in photo arrays, Monique had initially told police that she "cannot I.D." Watson, and Robin had testified that she

had not gotten a "good" look at the shooter. *Id.* (quoting the trial transcript). Given the absence of "other evidence identifying the petitioner as the shooter," Judge Gorenstein concluded, Watson had shown by clear and convincing evidence that, if Holloway's testimony were discarded as false, a reasonable jury would not have found him guilty. *Id.* at 20.

Having concluded that Watson met these gate-keeping requirements, Judge Gorenstein next examined whether Watson's petition was timely filed. Section 2244(d)(1) sets a one-year limitation period for filing a successive habeas petition, which began to run, Judge Gorenstein concluded, no later than June 22, 2011, the date of Holloway's recanting affidavit. Report at 22. And although the time during which Watson's § 440.10 motion was pending before the state court would have been tolled under § 2244(d)(2), Judge Gorenstein noted that Watson had not filed that motion until July 27, 2012, more than a month after the one-year statute of limitations had expired. Accordingly, Judge Gorenstein reasoned, Watson's petition was timely only if the statute of limitations were equitably tolled or overcome by a showing of actual innocence.

As to equitable tolling, Judge Gorenstein reasoned that while the one-year limitations period was subject to equitable tolling, Watson did not meet its strict requirements of extraordinary circumstances and reasonable diligence throughout the relevant period. Report at 24–25. A petitioner's limited funds to finance an investigation or suit, alone, do not establish equitable tolling, Report at 25, and Watson had not shown extraordinary circumstances, *id.* at 26.

Turning to the actual innocence gateway, Judge Gorenstein noted that a petitioner's showing must be both credible and compelling. He focused on whether Holloway's recantation met this standard. He found applicable 28 U.S.C. § 2254(e)(1), which provides that a state court's determination of a factual issue may be rebutted only by clear and convincing evidence. *Id.* at 27–28. Because Justice Price had found incredible—based on detailed and searching

analysis—Holloway's testimony at the § 440.10 hearing regarding her recantation, Judge Gorenstein examined the overall record to determine whether there was clear and convincing evidence sufficient to rebut that finding. To that end, Judge Gorenstein conducted a lengthy nine-page analysis of Justice Price's findings and Watson's critique of it. He considered Holloway's original trial testimony, her recantation, and her testimony at the § 440.10 hearing. He also considered other evidence, including the testimony of Diana Almonte, a witness to the shooting who did not testify at trial, evidence as to the crime scene, Justice Price's assessment of the credibility of Sevelie Jones, the detective on the case, and Holloway's inconsistent statements. *Id.* at 29–36.

In the end, Judge Gorenstein concluded, "[a] New York State Supreme Court Justice heard all the evidence on this question and concluded Holloway's recantation of her testimony was not credible and that her trial testimony was in fact 'credible.'" *Id.* at 37 (quoting Justice Price's opinion). And, he found, there was no clear and convincing evidence to overturn those findings. *Id.* Noting the absence of "any other significant evidence showing that Holloway's trial testimony was untruthful," Judge Gorenstein found that Watson's claim of actual innocence was unsupported by new reliable evidence. Thus, Watson could not overcome the bar to a successive petition. *Id.*

Judge Gorenstein therefore recommended that Watson's petition be denied as untimely. However, he recommended that a certificate of appealability issue pursuant to 28 U.S.C. § 2253(c) because the "case presents difficult questions and it is possible that with the application of a different standard of review as to our consideration of the state court opinion, the result might have been different." Report at 38.

**C.      Objections to the Report**

**1.      Respondent's Objections**

Respondent objects to two parts of the Report. First, he objects to the finding that Watson satisfied 28 U.S.C. § 2244(b)(2)(B)(ii), namely that he "has shown by clear and convincing evidence that no reasonable jury would have found him guilty if Holloway's testimony was shown to have been perjurious." Resp't Obj. at 1 (quoting Report at 20). Second, he objects to the finding that "the testimony at the [§ 440.10] hearing undercut Holloway's original estimate as to the distance between her and the shooter the second time she saw him." *Id.* (quoting Report at 33). The Court has considered each of these objections *de novo*. Neither is persuasive.

First, the Court agrees with Judge Gorenstein that, had Holloway's trial testimony been shown to have been perjurious, a reasonable jury would not have found Watson guilty. Section 2244(b)(2)(B)(ii) requires that the facts underlying a successive habeas petition, "if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that . . . no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii). Respondent argues that, even if Holloway's trial testimony were set aside, a reasonable jury would still have convicted Watson on the remaining evidence. Respondent relies largely on the trial testimony of Monique and Robin James to the effect that they heard gun shots from separate rooms in their home, and immediately looked out their respective windows; Monique also testified that she saw the shooter with the gun in hand. Resp't Obj. at 2. Respondent further notes that the out-of-court identifications by both sisters were received in evidence. *Id.* Respondent downplays the lack of a positive identification of Watson by either sister in court, attributing it to the sisters' fear; each had been compelled to testify pursuant to a material witness order. *Id.* Judge Gorenstein

15

considered these facts, but ultimately found that the sisters' testimony did not provide a solid basis, standing alone, for finding Watson guilty. "The lack of an in-court identification from the [James] sisters would certainly be troubling to a jury." Report at 20. Also weakening this testimony, Monique had "initially told the police that she 'cannot I.D.' [the shooter] (Jones: Tr. 703:8), and Robin had testified at one point that she had not gotten a 'good' look at the shooter (R. James: Tr. 663:15-17)." *Id.* Ultimately, because, other than Holloway's testimony, there was "no other evidence identifying [Watson] as the shooter," Judge Gorenstein concluded that the relative "dearth of proof" once Holloway's testimony was excised made it clear and convincing that a jury would not have found Watson guilty. Report at 20.

The Court, on considered review, finds Judge Gorenstein's reasoning persuasive. Like Judge Gorenstein, the Court views Holloway's testimony as the pivotal evidence of Watson's guilt. Given the limitations to the James sisters' testimony, the Court finds, with Judge Gorenstein, that it is clear and convincing that, with Holloway's testimony removed, it is likely the jury would not have returned a guilty verdict. Respondent's reliance on the James sisters' out-of-court identifications is all the more unpersuasive given problematic aspects of that evidence. The reliability of the sisters' selections from the photo arrays could be discounted as the possible product of suggestive placement: The photo of Watson was placed first of six in both the frontal and profile photo arrays and was the only face in the same position in both. Tr. 731–33.[1] Additionally, Robin was never shown a profile array, only a frontal array, *id.* at 736–37, and Monique could not pick Watson out of a frontal array, *id.* at 738. Monique's identification of Watson from an in-person lineup was also less than conclusive: She picked him out of a left-profile lineup, but not from a front-facing or right-profile lineup. *Id.* at 746–48.

---

[1] "Tr." refers to the trial transcript at Dkt. 38.

Respondent, while addressing the photo arrays presented to Watson, Resp't Obj. at 2 n.1, does not engage with those presented to the James sisters. *See id.* (citing Resp't Mem. at 19 n.14 (discussing only Holloway); *id.* at 20 n.15 (same)). The Court therefore adopts Judge Gorenstein's conclusion that, were Holloway's testimony discarded as false, a reasonable jury would not have found Watson guilty.

Respondent's second objection misreads the Report. Respondent objects to its description of retired detective Hal Sherman's § 440.10 hearing testimony regarding his present-day measurements of the crime scene, and its statement that these measurements undercut Holloway's trial testimony or her 2013 statement to the Bronx DA, both of which inculpated Watson. Respondent emphasizes that "Sherman's measurements were . . . of little value to the [§ 440.10] court in evaluating whether Ms. Holloway's trial testimony was accurate" and "do not impugn Ms. Holloway's [original] account." Resp't Obj. at 3. But, while the Report summarized Sherman's testimony at the § 440.10 hearing, it did not necessarily credit this testimony or rely on it. *See* Report at 12–13. The Report does state that "the testimony at the [§ 440.10] hearing undercut Holloway's original estimate" of distances. But that statement occurs immediately after a sentence expressing skepticism of Watson's challenge to the distances measured by Sherman. *Id.* at 33 (noting that Watson had "assume[d] that Holloway's testimony at the [§ 440.10] hearing was truthful and accurate as to her car's position in the parking lot.") In any event, Judge Gorenstein found Sherman's testimony to have little probative value—thus, the "omission of a discussion of [Sherman's] testimony d[id] not cast[] doubt on Justice Price's findings." *Id.* Respondent, at bottom, *agrees* with Judge Gorenstein that Sherman's measurements were and would have been of little value to Justice Price in evaluating Holloway's

truthfulness at trial. The Court therefore finds Respondent's second objection unpersuasive and ineffectual.

### 2. Watson's Objections

#### a. Deference Owed to the State Court's Factual Findings

Watson first objects that Judge Gorenstein, in resolving whether Watson had made a "credible" and "compelling" showing of actual innocence sufficient to support deeming his petition timely, "erroneously accorded deference to the state court's factual findings under 28 U.S.C. § 2254(e)(1)." Pet'r Obj. at 2.

Watson has identified a legal question that is open in the Second Circuit. As noted, whether Watson may bring a successive habeas petition is governed by 28 U.S.C. § 2244, but the merits of his petition are governed by § 2254. Section 2254(e)(1) provides that

> [i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1). The Second Circuit has not resolved whether a federal court evaluating the actual innocence gateway in a successive federal habeas proceeding is required under § 2254(e)(1) to defer to a state court's postconviction finding. Judge Gorenstein found that the § 2254(e)(1) presumption of correctness does apply; on that basis, he accorded deference to Justice Price's factual determination, on Watson's § 440.10 motion, that Holloway's recantation had been incredible. Judge Gorenstein reasoned that the plain text of § 2254(e)(1) applies to a gateway actual innocence claim.[2] As support, he noted the cases from other circuits collected in

---

[2] Another standard may yield the same outcome: 28 U.S.C. § 2254(d), which precludes the granting of a habeas petition "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the

*Jimenez v. Lilley*, 16 Civ. 8545 (AJN) (JCF), 2017 WL 4535946, at *8 (S.D.N.Y. Oct. 10, 2017).

*See* Report at 28. Watson counters that § 2254(e)(1)'s presumption of correctness does not apply to this gateway inquiry. He argues that the actual innocence gateway recognized in *Schlup* is an "equitable remedy" to which the statutory presumption ought not apply. Pet'r Obj. at 8–9.

This Court does not have occasion here to resolve this question. That is because the Court would reach the identical outcome—that Holloway's recantation is incredible—whether it accorded deference to Justice Price's assessment of the recantation or whether it evaluated that recantation *de novo*. The Court took the initiative of directing that Holloway give live testimony before it. The Court did so for several reasons: (1) because Holloway's trial testimony was central to Watson's conviction, such that her recantation, if credible, would likely result in relief for Watson; (2) because Judge Price, in finding Holloway's recantation incredible, gave attention not only to Holloway's words but her demeanor and carriage, and the Court was interested in making an independent and informed assessment of all considerations bearing on her credibility; and (3) because the open legal question as to whether a federal court assessing the actual innocence gateway owes deference to a state-court determination counseled in favor of the Court's hearing the recantation for itself. The Court benefited at the hearing from all counsels' able questioning of Holloway. The Court also put questions to Holloway, for the purpose of enabling it to assess her credibility.

---

State court proceeding." 28 U.S.C. § 2254(d). *Cf. Rivas v. Fischer*, 294 Fed. App'x 677, 679 (2d Cir. 2008) (summary order) (remanding habeas petition under § 2244 made after denial of a § 440.10 motion, directing district court to hold evidentiary hearing to evaluate timeliness under equitable tolling and actual innocence, and instructing district court "to be mindful that under 28 U.S.C. § 2254(d), a federal habeas court is required to give deference to findings of fact made by the state court . . ." (quoting *Oyague v. Artuz*, 393 F.3d 99, 104 (2d Cir. 2004) (quotation marks omitted))).

With all respect, the Court found Holloway's testimony recanting her trial testimony to be inconsistent, imprecise, incredible, and, as to key issues, incoherent. As to all relevant occurrences—the observations of the murder of Johnson, her ensuing identifications of Watson, her 2011 dealings with the defense investigator, her ensuing interview with the Bronx DA, and her testimony at the § 440.10 hearing—the Court found her testimony inconsistent and nonlinear. Holloway admitted that she had "told a couple of different stories," Hrg. Tr. 27, [3] over time. However, she was at points unable to remember what her accounts at different times have been. And when confronted with her different versions of events, she offered explanations that were at points irrelevant, incoherent, or laced with inexplicable metaphors or idioms. The Court was left with the durable impression that while Holloway gave straightforward testimony implicating Watson at trial, the Holloway of present is ill-equipped to give factual testimony that can be treated as reliable, rigorous, or faithful to the obligation of a sworn witness to hew to the truth.

A review of the transcript of Holloway's testimony before this Court will confirm these observations. The Court need not dwell on them. The Court offers the following excerpts only by way of illustration.

First, after Holloway became confused about what she had said at various points, the Court attempted to clarify an aspect of her conflicting testimony:

> THE COURT: Sorry to cut in but in between the original trial testimony and then your testimony here from 2013 you've submitted an affidavit that says the opposite, that you didn't see his face.
> THE WITNESS: Yes.
> THE COURT: So, Mr. Garber's question I think is recast as how come you went back to the old story of saying that you saw the shooter? Why in 2013, having recanted, having said you didn't see it, do you go back to the old trial story and say you did see it? I'm trying to understand that.
> MR. GARBER: Why so much—

---

[3] Citations to "Hrg. Tr." refer to the transcript of the Court's evidentiary hearing held on December 19, 2018, at Dkt. 69.

THE COURT: Sorry Mr. Garber. I asked her a question.

MR. GARBER: No problem.

THE WITNESS: I don't know. It's what I knew. It was—I don't know. I really—you know, I really don't know.

THE COURT: OK. Thank you.

　　　Go ahead, Mr. Garber.

THE WITNESS: I think I was afraid.

THE COURT: Sorry. You don't know or you think you were afraid?

THE WITNESS: No, I—you know I was probably afraid that something would happen to me now. That's probably why I'm in the jumbles, you know, when I'm doing this testimony because it's like the good devil and the bad devil and you just all messed up and people are talking to you, get all—I think that's what it was.

THE COURT: Tell me about the good devil and the bad devil.

THE WITNESS: You know the conscience thing, you know, da, da, da.

THE COURT: Were you hearing voices when you—

THE WITNESS: No. I'm just saying that I was—the truth—I know the truth but that I know that what I've been saying. So I'm having a hard time, you know, like committing to what I've been saying because I know it's not the truth. You understand what I'm trying to say?

THE COURT: No.

Hrg. Tr. 37–39.

On ensuing questioning, Holloway was unable to identify what had made her question her trial testimony. Watson's counsel attempted to help Holloway clarify why she had made statements during the 2013 interview with the Bronx DA consistent with her trial testimony. The following ensued:

Q. So I'm going to try to focus you in on your mind-set at that meeting in the D.A.'s Office. What were you thinking or feeling when you were talking to them about your presence there? Or just—withdrawn.

　　　What were you thinking or feeling at that time?

A. I was having, I guess, doubts, you know, like—

Q. Well were you being—

　　　THE COURT: Let's let the witness finish. I benefit by hearing her speak. Go ahead. Explain what you mean.

　　　THE WITNESS: Because like I kept on saying I didn't see his face, you know what I mean, so—and it was—it was much later. So my mind was going -- something must be wrong—I didn't see his face because we had the first one that was closer to the time. Then time went by. Why are we doing this again? And you know how—I guess your conscience. Because I didn't see his face. Maybe something was wrong, you know what I mean. So it was putting me on a flippy floppy thing.

THE COURT: What's the flippy floppy thing?

THE WITNESS: Like maybe I was wrong for siding with them or maybe he done it. I wasn't—I was on the flippy floppy thing.

Hrg. Tr. 46–47.

The Court's final attempt to gain clarification again yielded little:

THE COURT: Do you have any further explanation for me why when you met with the prosecutors in January of 2013 you again said you saw the person's face? Anything further you want to add just by way of an explanation?

THE WITNESS: I was afraid that I would go to jail, I would get in trouble for the lies that I told earlier. Nervous. Afraid. Whatever you want to call it.

MR GARBER: Are you afraid now?

THE WITNESS: Yes.

[. . .]

Q. I believe I asked you a question: Are you afraid now? What is your answer to that question?

A. No. I'm not afraid now.

Q. Why aren't you afraid now?

A. Because I—why aren't I? My kids are grown. You know what I mean. I am afraid of going to jail, yes. But I'm not as afraid as I was before. You know what I mean. I'm afraid of going to jail. I'm sick because I lied. But I didn't—I know it's a lie but I didn't believe I was—that don't make no sense. But I believed I was doing the right thing. So it didn't bother me until later on when I realized that maybe it wasn't the right thing to do. Then I was sick, mad, and afraid, you know.

Hrg. Tr. 48–49.

The assembled evidence thus leaves the Court without confidence in Holloway's recantation. On *de novo* review, the Court finds that Watson has made neither a credible nor a compelling showing of actual innocence. It follows that the same outcome would inhere were the Court to view Justice Price's findings after the § 440.10 hearing with deference. Indeed, having heard Holloway's testimony firsthand, the Court's views with particular respect Justice Price's nuanced and careful, yet emphatic, assessment as to why Holloway's recantation lacks credibility.

The Court therefore overrules Watson's legal objection to the Report based on Judge Gorenstein's having given deference to Justice's Price's assessment of Holloway's credibility.

### b.    *Actual Innocence Gateway*

Watson next objects to Judge Gorenstein's determination that there is no clear and convincing evidence of actual innocence so as to support finding the actual innocence gateway open to him. In his objections, Watson does not offer new arguments. Instead, he adopts the opening and reply memoranda he submitted to Judge Gorenstein. *See* Pet'r. Obj. at 9. As a result, the Court's review of Judge Gorenstein's Report on this point is for clear error.

The Court finds none. Finding § 2254(e)(1) applicable, Judge Gorenstein, as noted, deferred to Justice Price's assessment of why Holloway's recantation lacked credibility. Judge Gorenstein supplied sound reasons for finding Justice Price's assessment persuasive and worthy of such deference. And Watson's objections to the Report, although restating arguments about measurements of the crime scene, the James sisters' identifications, and Holloway's encounters with Watson's team, point to only one piece of new, ostensibly favorable, evidence: Diana Almonte's testimony at the § 440.10 hearing that the shooter's face was too obscured to be seen clearly. Pet'r Obj. at 18–19. But even crediting that Almonte could not see the shooter's face clearly does not meaningfully undermine Holloway's trial testimony, as the Report ably explained. *See* Report at 32 ("Almonte's view of the shooter right before the killing and Holloway's view of him passing in front of his car occurred at different points in time and from different vantage points.").

In any event, this Court has supplemented the evidence that the Report considered in making its determination that Watson had failed to come forward with credible and compelling evidence of actual innocence. For the reasons above, the Court has independently determined, on *de novo* review, and after giving close consideration to Holloway's testimony, that Watson's evidence of actual innocence does not satisfy—indeed, it falls far short of—this standard.

The Court therefore overrules this objection. The Court adopts Judge Gorenstein's finding that "[i]n light of the absence of any other significant evidence showing that Holloway's trial testimony was untruthful, we cannot find that the evidence of actual innocence is supported by 'new reliable evidence' such as a 'trustworthy eyewitness account[].'" Report at 37 (quoting *Schlup*, 513 U.S. at 324) (alteration in Report).

*c.    Equitable Tolling*

Watson finally objects to Judge Gorenstein's finding that his petition did not meet the requirements of equitable tolling. Pet'r Obj. at 20–22. Because Watson's objection does no more than restate arguments made in the Amended Petition,[4] the Court reviews the Report's findings for clear error.

The one-year period of limitation in § 2244(d) may be equitably tolled. *Holland v. Florida*, 560 U.S. 631, 645 (2010). However, a petitioner seeking equitable tolling "must show that extraordinary circumstances prevented him from filing his petition at the time," *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) (citing *Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir. 1996)), and that he "acted with reasonable diligence through the period he seeks to toll," *id.* (citing *Johnson*, 86 F.3d at 12).

Here, Judge Gorenstein found that the date of Holloway's recanting affidavit, signed June 21, 2011, was the latest on which Watson could claim to have discovered the factual predicate for his petition.[5] *See* 28 U.S.C. § 2244(d)(1)(D). Watson, however, did not file his § 440.10

---

[4] The Report notes that Watson's Amended Petition did not pursue equitable tolling explicitly, but instead did so implicitly, insofar as it argued that Watson had acted diligently in locating Holloway. Report at 24. Regardless, the arguments in Watson's objections (e.g., that he lacked funds earlier to pursue the habeas petition earlier) track those in the Amended Petition.

[5] Although Watson characterizes this date as when "the statute arguably began to run," he, tellingly, does not propose an alternative date. Pet'r Obj. at 22.

motion until July 27, 2012, more than 13 months later. Thus, Judge Gorenstein found, while the statute of limitations would have been tolled while Watson's § 440.10 motion was pending, *id.* § 2244(d)(2), Watson first filed that petition more than a month too late. Report at 23.

Watson primarily takes issue with Judge Gorenstein's finding that, after Holloway had been located and executed her affidavit, he did not act with "reasonable diligence" to file his § 440.10 motion. *See* Pet'r Obj. at 22. Judge Gorenstein noted that Watson had stated only that he had needed time for "additional monies . . . to be raised for legal fees and further investigation." Report at 25. Under the case law, he noted, lack of funding is not by itself a basis for equitable tolling. *Id.* (citations omitted). In his objections, Watson now states that meeting the requirements of filing a § 440.10 motion represented "extraordinary circumstances." And, he claims, he had difficulty arranging to speak with Almonte and Mercedes De La Paz, a potential alibi witness. *See* Pet'r Obj. at 22.

These arguments are unavailing. Nothing about the requirements of New York Criminal Procedure Law § 440.10(3)(c) is "extraordinary." Watson points to a provision of that statute providing "that a motion to vacate may be denied without a hearing where, upon a previous motion 'the defendant was in a position adequately to raise the ground or issue underlying the present motion but did not do so.'" Pet'r Obj. at 21 n.9 (quoting N.Y. Crim. Proc. Law § 440.10(3)(c)). But that provision does not account for Watson's failure to file the § 440.10 more than 13 months after securing the Holloway affidavit. Watson's excuse as to Almonte fares no better: She notified Watson's legal team that she refused to be interviewed on June 5, 2012, before the limitations period had expired. *See* Pet'r Obj. at 21. Finally, as to De La Paz, a defense investigator had met with her in 2011 and failed to obtain an affidavit. Dkt. 42-5 ¶ 45 (Affidavit of Robert J. Boyle in § 440.10 proceeding). That she later proved hard to find when a

defense investigator pursued her anew does not give rise to an "extraordinary circumstance" justifying equitable tolling.

The Court therefore adopts Judge Gorenstein's finding that Watson's petition is untimely. It is subject to neither the actual innocence exception nor to equitable tolling.

## CONCLUSION

For the reasons stated above, the Court adopts the Report's findings and conclusions. On its own terms, the Report is thorough, convincing, and persuasive. Further, having supplemented the record to hear live testimony from witness Holloway and having undertaken *de novo* review, the Court finds that such testimony reinforces the Report's conclusion. Holloway's testimony does not supply credible or compelling evidence of Watson's actual innocence so as to overcome the time bar to Watson's petition. The Court therefore denies Watson's petition.[6]

In recognition of the fact that the credibility of Holloway's recantation is a critical issue to the determination of Watson's Amended Petition, the Court, however, issues a certificate of appealability.

The Clerk of Court is respectfully requested to terminate the motions pending at Dkts. 28 and 74 and to close this case.

---

[6] Watson's counsel recently alerted the Court that he has initiated an investigation into alleged misconduct by the lead detective in this case, Sevelie Jones. *See* Dkts. 74–77. The Court declines to stay resolution of Watson's pending petition on this ground. Any application for relief based on the outcome of that investigation must be brought in a separate action, e.g., a new § 440.10 motion or a successive habeas petition. *Cf.* Dkt. 75 (Respondent's letter). This Court has not considered how the potential outcomes of that investigation might affect the evaluation of Holloway's trial testimony. For avoidance of doubt, the Court's decision not to delay resolution of a petition that has been pending for some 32 months should not be used to impair Watson's right to seek relief in a subsequent proceeding he may initiate based on the outcome of his counsel's investigation.

SO ORDERED.

Paul A. Engelmayer
Paul A. Engelmayer
United States District Judge

Dated: February 21, 2019
       New York, New York